OPINION OF THE COURT
SCIRICA, Chief Judge.
In this civil rights action for damages under 42 U.S.C. § 1983, plaintiffs were arrested for disorderly conduct on the campus of Indiana University of Pennsylvania, a state university. At issue in this First Amendment suit is whether the arresting officers are entitled to qualified immunity. Also at issue is whether resolution of a criminal charge under Pennsylvania’s “Accelerated Rehabilitative Disposition” program bars a subsequent § 1983 claim. The District Court granted defendants summary judgment on all claims. We will affirm.
I.
Although with no formal religious training, James Gilíes is a self-styled “campus-evangelist” who has appeared at college campuses across the country since 1982. He preaches against what he calls the “big four”—“drugs, sex, booze, and rock and roll.”
Around noon, October 5, 2001, Gilíes appeared and began preaching in the open air at the Oak Grove, a busy area open to the public on the campus of Indiana University of Pennsylvania. With him were some twenty-five members of the “Campus Ministry,”[1] including Timothy Petit, with a video-camera. Gilíes preached on the evils of pre-marital sex, drinking, and homosexuality. The District Court estimated a crowd of 75-100 students gathered.[2]
In a provocative manner, Gilíes accosted the crowd, preaching that Indiana University of Pennsylvania’s student body was full of “fornicators,” “whores,” “drunken little devils,” “drunkards,” and “drugs, sex, booze, and rock and roll freaks.” His speech and manner drew reactions from the students. One threw an apple core at Gilíes. Another shouted “get your fucking God off our campus.” This set off some name-calling. Gilíes asked the man if he was a communist, which drew the retort, “you’re a small minded man.” Gilíes called another a “high school flunky.” When someone approached to tell Gilíes he was interrupting classes, Gilíes called him “cigarette breath.” The man responded, “don’t be belittling me. It is Goddamn campus policy ... You will not preach while classes are in session.” Gilíes retorted, “oh yes I will, devil.”
*202 The crowd became more animated in response to Gilíes’ invective against homosexuals. Gilíes cautioned the students to “watch out [because] the homosexuals are after you on this campus” and pronounced that “nothing is lower than a lesbian.” Gilíes warned that “homosexuals and lesbians are headed for hell” and that “there is no such thing as a Christian lesbian ... [or] Christian homosexual.” One woman volunteered that she was a Christian lesbian. Gilíes took a pejorative tone, taunting, “oh, my, you ma'am are most confused. She thinks she’s a Christian lesbo. She’s a lesbian for Jesus.” Gilíes asked the woman, “do you lay down with dogs? Are you a bestiality lover? ... Can you be a bestiality lover and a Christian also?” This engendered angry responses from the crowd, including one who shouted at Gilíes, “I don’t know, ask your mom.”
Apparently, someone called the campus police, and Sergeant Gregory Davis and Officer Christopher Goenner of the Indiana University of Pennsylvania police force responded to the reported “near riot taking place.” Davis heard Gilíes call one person a “lesbian” and “homosexual” and said that some members of the crowd complained to him that Gilíes was singling out individuals, calling them names. After Davis approached Gilíes and had a brief conversation, he arrested Gilíes for disorderly conduct, among other charges. Davis handcuffed Gilíes and escorted him to the police car.
Davis transported Gilíes to Indiana University of Pennsylvania’s Department of Public Safety building, where he was held for three to four hours. Gilíes contends he complained that the handcuffs were too tight and were not removed for a few hours. He never sought out a physician for treatment.
Gilíes was charged with disorderly conduct, failure of disorderly persons to disperse, defiant trespass, riot and violating Pennsylvania’s Wiretap Act (he had recorded the incident with the police using a dictaphone hidden in his pocket). He was taken to the Indiana County Correctional Facility. Four days later on October 9, 2001, he posted a $5,000 bond and was released.[3]
Timothy Petit, who videotaped Gilíes’ activity, was also arrested. Officer Goenner confiscated his video-camera at the direction of Officer Davis. Petit was charged with resisting arrest, disorderly conduct, and failure of disorderly persons to disperse, and was released from custody later that day. Petit entered into the “Accelerated Rehabilitative Disposition” (“ARD”) program, which permits expungement of the criminal record upon successful completion of a probationary term.
After the arrests, Bradley Hoffman, a member of Campus Ministry, inquired with the university about obtaining a solicitation permit. Hoffman submitted a “Request/Permit for Use of Campus Space for Solicitation” to “pass [ ] out Gospel Tracts” and “shar[e] ... the Gospel.” The permit was rejected by Terry Appolonia, the director of the Center for Student Life. An e-mail from Appolonia’s supervisor, Rhonda Luckey (Associate President of Student Affairs), advised that she had “grave concerns” about the behavior of the group given the earlier incident.
At a preliminary hearing on November 28, 2001, a District Justice held Gilíes on *203 the charges of disorderly conduct, failure of disorderly person to disperse, disorderly conduct and defiant trespass. The charges of riot and violating the Pennsylvania Wiretap Act were dismissed. On December 27, 2002, the Court of Common Pleas of Indiana County, Pennsylvania, granted Gilíes’ petition for a writ of habeas corpus and dismissed all the remaining criminal charges.
Gilíes brought the following claims under § 1983:(1) malicious prosecution against Sergeant Davis, (2) false arrest against Sergeant Davis, and (3) excessive force against Sergeant Davis, based on Gilíes’ assertion that the handcuffs were unnecessarily tight. Gilíes and Petit brought these claims under § 1983:(1) First Amendment violations by Officers Davis and Goenner, (2) First Amendment violations by Appolonia and Luckey, claiming Indiana University of Pennsylvania’s permit policy was viewpoint based and standardless, vesting unbridled discretion in Appolonia and Luckey, and (3) First Amendment violation by William Montgomery, the Director of Public Safety who supervises the Indiana University of Pennsylvania police department, for failure to train and monitor police and officials charged with permit decision making. Gilíes and Petit requested a declaratory judgment that Indiana University of Pennsylvania’s permit policy is in violation of the First Amendment. In addition, Gilíes and Petit sought punitive damages against Sergeant Davis and a state-law replevin for return of the confiscated videotape.
The District Court granted defendants summary judgment on all claims, and declined to exercise supplemental jurisdiction over the remaining state law replevin claim.
II.
The District Court had jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291. The standard of review is plenary over a grant of a motion for summary judgment. Camiolo v. State Farm Fire & Cas. Co., 334 F.3d 345, 354 (3d Cir.2003) (internal citations omitted). The District Court’s grant of summary judgment in favor of the appel-lees will be affirmed if it appears that “there is no genuine issue as to any material fact and that they are entitled to a judgment as a matter of law.” Id.
III.
A. Gilíes’ Claims
1. First Amendment
With respect to Gilíes’ malicious prosecution, false arrest, and First Amendment claims, the District Court held that Sergeant Davis was entitled to qualified immunity. “[Gjovernment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The qualified immunity standard “gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.” Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (internal quotations omitted). In determining qualified immunity, we first ask whether “the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the officer’s conduct violated a constitutional right.” Curley v. Klem, 298 F.3d 271, 277 (3d Cir.2002). If so, we then ask whether it “would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Id. (quoting *204 Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).
Whether it would have been clear to a reasonable officer that probable cause justified the arrest requires an examination of the crime at issue, disorderly conduct. Gilíes was charged with disorderly conduct under Pennsylvania Criminal Code, 18 Pa.C.S. § 5503(a). The statute provides:
(a) Offense defined.—A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
(1) engages in fighting or threatening, or in violent or tumultuous behavior;
(2) makes unreasonable noise;
(3) uses obscene language, or makes an obscene gesture; or
(4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.
Under the statute, whether “words or acts rise to the level of disorderly conduct hinges upon whether they cause or unjustifiably risk a public disturbance.” Commonwealth v. Hock, 556 Pa. 409, 728 A.2d 943, 946 (1999). When the regulated conduct consists of. speech, however, the statute must “be carefully drawn or authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression.” Johnson v. Campbell, 332 F.3d 199, 211 (3d Cir.2003) (quoting Gooding v. Wilson, 405 U.S. 518, 522, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)); Commonwealth v. Mastrangelo, 489 Pa. 254, 414 A.2d 54, 58 (1980) (“disorderly conduct statute may not be used to punish anyone exercising a protected First Amendment right”). Speech that does not receive First Amendment protection, in turn, “include[s] the lewd and obscene, the profane, the libelous, and the insulting or ‘fighting’ words[.]” Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).
Under the first step of the qualified immunity analysis, the issue is whether Davis’ conduct violated Gilíes’ First Amendment rights.[4] The District Court held Gilíes’ speech constituted “fighting words,” “those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.” Mem. Op. at *13-15 (W.D.Pa. Apr. 22, 2004) (quoting Chaplinsky, 315 U.S. at 571-72, 62 S.Ct. 766);[5] see also Texas v. Johnson, 491 U.S. 397, 409, 109 S.Ct. 2533, 105 *205 L.Ed.2d 342 (1989) (“To be punishable, words must do more than bother the listener; they must be nothing less than an invitation to exchange fisticuffs.”) (quoting Chaplinsky, 315 U.S. at 572-73, 62 S.Ct. 766). Put another way, fighting words are “likely to provoke the average person to retaliation, and thereby cause a breach of the peace.” Texas v. Johnson, 491 U.S. at 409, 109 S.Ct. 2533 (quoting Chaplinsky, 315 U.S. at 574, 62 S.Ct. 766).
We believe that much of Gilíes’ speech was protected under the First Amendment. Crucial to this determination is that we view the facts in the light most favorable to Gilíes (the non-moving party) under the summary judgment standard and the first prong of the qualified immunity analysis.
Of Gilíes’ questionable speech, some was derogatory language generieally directed to the crowd (e.g., “by definition, there are thousands of fornicators on this campus,” “drunkards are everywhere on this campus”). This type of language, when not personally directed at a particular member of the audience, is not likely to incite an immediate breach of the peace. See Cohen v. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (noting that fighting words are “personally abusive epithets ... directed to the person of the hearer”) (internal quotations omitted). Gilíes also specifically directed insults to certain people (“cigarette breath,” “devil,” “communist,” etc.). But on summary judgment, at least, we believe this speech in this context could be reasonably viewed as unpleasant but petty, and not sufficiently provocative to constitute fighting words. It bears noting that the videotape reveals that Gilíes’ speech and manner were in part and to some degree lacking in bite. For example, Gilíes stated that “every Mormon is damned to hell,” but added a comical overtone by finishing the sentence, “including, Donnie and Maria Osmond.” His manner varied between hostile and jaunty, and sometimes exuded an air of theatrical exaggeration {e.g., Gilíes emphasized a point by fully extending his arms in front of him towards the sky, projecting his voice as one might do in a play).
Nonetheless, Gilíes’ epithets directed at the woman who identified herself as a Christian and a lesbian (“Christian lesbo,” “lesbian for Jesus,” “do you lay down with dogs,” “are you a bestiality lover”) were especially abusive and constituted fighting words. Where part of speech constitutes fighting words, the police may arrest for disorderly conduct even though other parts of the speech may be less provocative. See, e.g., Ovadal v. City of Madison, Wisconsin, 416 F.3d 531, 535 (7th Cir.2005) (“conduct which is in fact disorderly is not insulated because it is perpetrated while engaged in a protest demonstration”) (internal quotations omitted).
Even if the lesbian/bestiality invectives did not constitute fighting words, we believe Sergeant Davis is entitled to qualified immunity. Under the second step of the analysis, a police officer is entitled to qualified immunity unless it would have been clear to a reasonable officer there was no probable cause to arrest. See Paff v. Kaltenbach, 204 F.3d 425, 437 (3d Cir.2000) (“If there are cases that would make it apparent to a reasonable officer in [the arresting officer’s] position that probable cause was lacking, qualified immunity is not available.”) (internal quotations omitted); see also Kijonka v. Seitzinger, 363 F.3d 645, 648 (7th Cir.2004) (“whether there was any reasonable basis to suppose there was probable cause ... is the test for qualified immunity”).
*206 Gilíes’ speech was rude, mocking, confrontational, and insulting.[6] When viewed on the videotape, the crowd responses span the spectrum from pettiness to genuine hostility. Many in the crowd were upset and angry with Gilíes at the time Officer Davis intervened.
The words Gilíes directed at the woman who identified herself as a Christian and a lesbian were abusive, akin to a racial slur. For a police officer confronting Gilíes in the field, with little time to parse Gilíes’ speech, it was not unreasonable to believe Gilíes engaged in disorderly conduct.
At the least, reasonable minds could disagree whether Gilíes’ speech was protected. Subsequent to his arrest, the Court of Common Pleas dismissed all charges against Gilíes, including the charge of disorderly conduct. Yet, Gilíes has been convicted before for similar conduct. In a factually similar incident, the Indiana Court of Appeals upheld a disorderly conduct conviction for preaching to a crowd at a festival. See Gilles v. Indiana, 531 N.E.2d 220, 222-23 (Ind.App. 4 Dist.1988). Holding it was “readily apparent” that Gilíes used fighting words, the court focused on his use of the words “whores,” “queers,” “AIDS people,” “drunkards,” and “scum of the earth.” The court reasoned that “Gilíes placed his listeners in categories defined by sexual activity, sexual orientation, and sexually transmitted disease. This language was inherently likely to provoke a violent reaction.” Id. at 223. In any event, that there is more than one judicial view of Gilíes’ conduct strongly suggests that qualified immunity is appropriate here.
Finally, whether it was reasonable to believe there was probable cause is in part based on the limited information that the arresting officer has at the time. See BeVier v. Hucal, 806 F.2d 123, 127 (7th Cir.1986) (“probable cause is a function of information and exigency”); Colbert v. Angstadt, 169 F.Supp.2d 352, 360-61 (E.D.Pa.2001) (holding probable cause to arrest existed where the facts and circumstances within the arresting officer’s knowledge were sufficient for a reasonable person to believe that an offense had been committed). Sergeant Davis appears to have arrived at the scene fifteen to twenty minutes after Gilíes began to speak. According to Davis, he was summoned to a “near riot situation.” He briefly spoke with members of the crowd about what had transpired. According to Davis, members of the crowd reported to him that “Gilíes was ... picking people out of the crowd individually and calling them names and questioning their sexual identity, questioning their sexual orientation.” We see no reason why Davis’ reliance on their accounts was unreasonable.
Taking account of the entire episode and the information Davis possessed at the time, we hold Davis is entitled to qualified immunity because it would not have been clear to a reasonable officer that Gilíes did not engage in disorderly *207 conduct.[7] While the Court of Common Pleas held Gilíes’ speech was insufficient to constitute disorderly conduct, it does not necessarily follow that the arresting officers are civilly liable for the arrest. Qualified immunity encompasses mistaken judgments that are not plainly incompetent. Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). Under qualified immunity, police officers are entitled to a certain amount of deference for decisions they make in the field. They must make “split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.” Saucier v. Katz, 533 U.S. 194, 204-05, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The reasonableness of the officer’s belief should be judged from that on-scene perspective, not with the perfect vision of hindsight. Id.; see also Graves v. City of Coeur D’Alene, 339 F.3d 828, 848 n. 25 (9th Cir.2003) (“The qualified immunity defense recognizes that officers make probable cause assessments in the field under pressure and therefore affords the officer leeway, permitting a reasonable mistake without resulting individual liability of the officer, when the law is not clearly established.”)
2. Excessive Force
The District Court granted summary judgment to defendants on Gilíes’ excessive force claim that his handcuffs were too tight. In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, “after resolving all factual disputes in favor of the plaintiff, [ ] the officer’s use of force was objectively reasonable under the circumstances.” Kopec v. Tate, 361 F.3d 772, 777 (3d Cir.2004) (internal quotations omitted). In Kopec, we reversed the grant of summary judgment, but cautioned that the “opinion should not be overread as we do not intend to open the floodgates to a torrent of handcuff claims.” Id. The plaintiff in Kopec contended he was in extreme pain, which would have been obvious to the arresting officer. In addition to repeated complaints about the pain, the plaintiff allegedly fell to the ground and “began to faint.” Id. Furthermore, the plaintiff alleged permanent nerve damage in one wrist, for which a surgeon treated him for over one year. Id. at 774.
Gilles contends that two matters should have alerted Davis to his alleged pain. First, he notes that he loudly sang religious songs while in custody, in part, he says, to take his mind off of the pain. Even if true, it is not necessarily objectively reasonable to deduce from Gilíes’ singing that the handcuffs were causing him pain. Furthermore, Gilíes testified that the purpose of his singing was “primarily to rejoice in the fact that I was being persecut *208 ed for righteousness’ sake for preaching the Gospel.” Second, Gilíes contends he complained of pain to unidentified officers who allegedly passed the information to Davis, who allegedly instructed them not to adjust the handcuffs. Unlike Kopec, where the plaintiff fell to the ground and fainted with pain, obvious visible indicators of Gilíes’ pain were absent (other than his alleged complaint that the handcuffs were too tight). As the District Court noted on viewing the videotape of the arrest, Gilíes demonstrated no expression or signs of discomfort at the time he was handcuffed. Nor did Gilíes seek or receive medical treatment after the fact. The only doctor Gilíes ever saw relating to this incident was on April 13, 2004, two and a half years after the arrest. At that time, Gilíes did not seek medical treatment, but rather an “independent medical evaluation.” The plaintiff in Kopec alleged permanent nerve damage for which a hand-surgeon had treated him for over a year. In this case, we hold the facts alleged constitute insufficient evidence as a matter of law for excessive force by handcuffing.
3. Standing
Gilíes and Petit contend the Indiana University of Pennsylvania permit or registration policy and its application by Appolonia and Luckey violated their First Amendment rights. The District Court held Gilíes and Petit had no standing to bring the challenge because they had not applied for a permit.
The traditional rules of standing require that the plaintiff has suffered an “injury in fact,” which is “concrete and particularized” and “actual or imminent.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The District Court held plaintiffs failed to show they personally suffered some actual or threatened injury as a result of Indiana University of Pennsylvania’s permit policy or the application of that policy. As the District Court found, Gilíes and Petit never applied for nor were they denied a permit. Gilíes and Petit appear to argue that Bradley Hoffman’s after the fact application confers standing on them. The argument is meritless.
Under a First Amendment exception to the traditional standing rules, litigants “are permitted to challenge a statute not because them own rights of free expression are violated, but because of a judicial prediction or assumption that the statute’s very existence may cause others not before the court to refrain from constitutionally protected speech or expression.” Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). This exception is inapplicable to Gilíes and Pet-it. The policy they challenge does not unduly restrict First Amendment freedoms, nor does it deter third parties from engaging in protected expression. By its terms, it merely allows the university to “regulate the time, manner, and location of any and all solicitation activities on campus” so as to ensure such activities do not “create undue noise or disruption or interfere with the activities that normally occur in the area in question.” Accordingly, we hold Gilíes and Petit lack standing to challenge the permit policy.
B. Petit’s Claims
Timothy Petit sought damages under § 1983 against Sergeant Davis, Officer Goenner, Indiana University of Pennsylvania administrators Appolonia and Luckey, and William Montgomery, the Director of Public Safety who supervises the Indiana University of Pennsylvania police department. The District Court held that Petit’s claims were barred under Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Under Heck, a *209 § 1983 action that impugns the validity of the plaintiffs underlying conviction cannot be maintained unless the conviction has been reversed on direct appeal or impaired by collateral proceedings. As the District Court noted, Petit resolved the charges against him by entering into Pennsylvania’s Accelerated Rehabilitation Disposition program.[8] After a successful probationary period, the charges were expunged from his criminal record. The District Court found, however, that under Heck expungement under the ARD Program is not a result “favorable” to the plaintiff.
When a criminal defendant is selected for and decides to participate in the ARD program, he avoids trial and potential jail time, and receives expungement of the record in exchange for successfully completing a probationary period. See generally Pa. R.Crim. P. 300 et seq.; Junod v. Bader, 312 Pa.Super. 92, 458 A.2d 251, 253-54 (1983).[9] The Comment to Rule 312 of the Pennsylvania Rules of Criminal Procedure states that “acceptance into an ARD program is not intended to constitute a conviction,” but “it may be statutorily construed as a conviction for purposes of computing sentences on subsequent convictions.” Pa. R.Crim. P. 312 (Comment). By entering the ARD program, the defendant waives his right to prove his innocence, but at the same time, does not admit guilt.
As Heck noted, § 1983 “creates a species of tort liability.” 512 U.S. at 483, 114 S.Ct. 2364. Thus, common law bars to suit apply to claims brought under § 1983. Id. In Heck, the Court held a § 1983 malicious prosecution claim was subject to the common law requirement that the plaintiff show the prior criminal proceeding terminated in his favor. Id. at 484, 114 S.Ct. 2364. The purpose of the requirement, the Court explained, is to avoid parallel litigation of probable cause and guilt. Id. It also prevents the claimant from succeeding in a tort action after having been convicted in the underlying criminal prosecution, which would run counter to the judicial policy against creating two conflicting resolutions arising from the same transaction. Id.
These reasons are equally applicable in this context. Petit’s underlying disorderly conduct charge and his § 1983 First Amendment claim require answering the same question—whether Petit’s behavior constituted protected activity or disorderly conduct. If ARD does not constitute a favorable termination, success in the § 1983 claim would result in parallel litigation over whether Petit’s activity constituted disorderly conduct and could result in a conflicting resolution arising from the same conduct.
We recognize that concurring and dissenting opinions in Spencer v. Rem- *210 na, 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998), question the applicability of Heck to an individual, such as Petit, who has no recourse under the habeas statute. See id. at 19-20, 118 S.Ct. 978 (Souter, J., concurring); id. at 21, 118 S.Ct. 978 (Ginsburg, J., concurring); id. at 25 n. 8, 118 S.Ct. 978 (Stevens, J., dissenting). But these opinions do not affect our conclusion that Heck applies to Petit’s claims. We doubt that Heck has been undermined, but to the extent its continued validity has been called into question, we join on this point, our sister courts of appeals for the First and Fifth Circuits in following the Supreme Court’s admonition “to lower federal courts to follow its directly applicable precedent, even if that precedent appears weakened by pronouncements in its subsequent decisions, and to leave to the Court ‘the prerogative of overruling its own decisions.’ ” Figueroa v. Rivera, 147 F.3d 77, 81 n. 3 (1st Cir.1998) (citing Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)); see Randell v. Johnson, 227 F.3d 300, 301-02 (5th Cir.2000).
Because the holding of Heck applies, Petit cannot maintain a § 1983 claim unless successful completion of the ARD program constitutes a “termination of the prior criminal proceeding in favor of the accused.” Heck, 512 U.S. at 485, 114 S.Ct. 2364. We have not had occasion to address this issue directly.[10] Our trial courts have held that ARD is not a termination favorable for purposes of bringing a subsequent § 1983 malicious prosecution claim.[11]
We find instructive opinions from the Second and Fifth Circuits that have addressed whether similar pre-trial probationary programs are a favorable termination sufficient to bring a subsequent civil suit. In Roesch v. Otarola, 980 F.2d 850 (2d Cir.1992), the Court of Appeals for the Second Circuit held that dismissal of a Connecticut criminal prosecution under its “accelerated pretrial rehabilitation” pro *211 gram was not sufficiently favorable to support a § 1983 malicious prosecution claim.[12] The court reasoned that permitting “a criminal defendant to maintain a section 1983 action after taking advantage of accelerated rehabilitation, the program, intended to give first-time offenders a second chance, would become less desirable for the State to retain and less desirable for the courts to use because the savings in resources from dismissing the criminal proceeding would be consumed in resolving the constitutional claims.” Id. at 853.
Roesch relied upon Singleton v. City of New York, 632 F.2d 185, 193-95 (2d Cir.1980). In Singleton, the court considered a mechanism under New York Criminal Procedure similar to the ARD program, termed “adjournment in contemplation of dismissal.” See N.Y.Crim. Proc. Law § 170.55. Under an adjournment in contemplation of dismissal, after the accused serves a probationary period, the charges are dismissed. The court likened the adjournment in contemplation of dismissal to a consent decree, reasoning that both leave open the question of guilt. Id. at 193. But the court refused to equate dismissal with acquittal. Id. The court found significance in the probationary period, calling it an unfavorable “period of observation ... to determine whether the prosecutor’s acquiescence in the adjournment was justified.” Id. at 194. Regarding expungement of the records related to the charge, the court found this erased “the stigma that might otherwise be borne by the défendant,” in the same way laws treat juvenile delinquents who have committed criminal acts, but does not constitute a finding of “not guilty.” Id.
In Taylor v. Gregg, 36 F.3d 453, 455-56 (5th Cir.1994), the Court of Appeals for the Fifth Circuit adopted Singleton’s reasoning, holding that a “pre-trial diversion order” is not a favorable termination. Like the ARD program, offenders who successfully complete Texas’ diversion program receive dismissal of their charges. The court held that “criminal defendants are effectively foregoing their potential malicious prosecution suit in exchange for conditional dismissal of their criminal charges.” Id. at 456.
The ARD program is a court-supervised compromise. See Davis, 493 F.Supp. at 92; see also Commonwealth v. Kindness, 247 Pa.Super. 99, 371 A.2d 1346 (1977) (describing termination of criminal charge under ARD program as a court-supervised compromise). Nevertheless, the ARD program imposes several burdens upon the criminal defendant not consistent with innocence, including a probationary term, “restitution ... imposition of costs, and imposition of a reasonable charge relating to the expense of administering the program, and such other conditions as may be agreed to by the parties.” Pa. R.Crim. P. 316(a). We agree with Singleton that probation constitutes an “unfavorable” period of judicially imposed limitations on freedom in which the probationer’s violation of the program’s terms may result in criminal prosecution. Singleton, 632 F.2d at 193-95. Viewing these factors together, we hold the ARD program is not a favorable termination under Heck.[13] Petit’s participation in the ARD *212 program bars his § 1983 claim.[14]
Conclusion
For the foregoing reasons, we will affirm the District Court’s grant of summary judgment dismissing Gilíes’ and Petit’s claims.

. According to Gilíes' deposition, the Campus Ministry is his “business” and sole source of employment. He states that it is a sole proprietorship, not a non-profit entity.

. We recount the events in the light most favorable to the nonmoving party. In this case, one of the plaintiffs videotaped the incident. The parties do not dispute its accuracy and we rely upon it.

. Under the Pennsylvania Rules of Criminal Procedure, ten percent of the bond amount may be sufficient for release. Pa. R.Crim. P. 528(c) ("After determining the amount of the monetary condition, the bail authority may permit the deposit of a sum of money not to exceed 10% of the full amount of the monetary condition if he or she determines that such a deposit is sufficient to ensure the defendant’s appearance and compliance.”).

. Whether Gilíes' speech was protected depends, in part, on whether he had a right to speak at the Oak Grove. We do not believe Indiana University of Pennsylvania’s solicitation policy required Gilíes to obtain permission or approval to use the Oak Grove area. Regarding “public outdoor areas,” which on this record appears to include the Oak Grove area, the policy states, “[a]ll activities involving commercial solicitation and/or fundrais-ing for noncommercial purposes in public outdoor areas must be requested and approved a minimum of ten days in advance by the Center for Student Life.” Gilíes' conduct does not constitute commercial solicitation or fund-raising for noncommercial purposes. This conclusion finds support in the deposition of Terry Appolonia, the Director of the Center for Student Life in charge of granting and denying solicitation requests. Appolonia conceded that “[t]he policy does not state an application is needed for noncommercial activities in outdoor locations.”

. Applying this standard, the Pennsylvania Supreme Court held that a disorderly conduct conviction did not run afoul of the First Amendment where the criminal defendant had followed a meter maid for two consecutive days, shouting vulgarities at her in a threatening manner. Mastrangelo, 414 A.2d at 58. But a disorderly conduct conviction was not appropriate for a non-threatening, profane remark directed at a police officer. Hock, 728 A.2d at 947.

. As noted, in addition to reviling the student body in general, Gilíes initiated and exchanged insults with individual students. As noted, he asked one person if he was a communist and another if he was a "high school flunky.” When told he was interrupting class, Gilíes called the interlocutor "cigarette breath” and "devil.” The crowd's reaction varied, but included some notably hostile reactions. An unidentified person threw an ap-pie core at Gilíes, striking his briefcase. Two other persons shouted at Gilíes, "get your fucking God off our campus” and "[you’re a] small minded man.” There was a confrontation with the person Gilíes called "cigarette breath,” who, upset, approached Gilíes up close, saying, "who are you, brown tie, and ugly pants? Don’t be belittling me. It is Goddamn campus policy.”

. In addition to holding Sergeant Davis is entitled to qualified immunity, we hold Gilíes's and Petit’s First Amendment claim fails against William Montgomery, the Director of Public Safety who supervises the Indiana University of Pennsylvania police department. A supervising authority may be liable under § 1983 for failing to train police officers when the failure to train demonstrates deliberate indifference to the constitutional rights of those with whom the officers may come into contact, notwithstanding the qualified immunity of an officer at the scene. See City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). But to establish liability on a failure to train claim under § 1983, plaintiffs "must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred.” Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir.1997). Gilíes and Petit have not pled the necessary elements to state a claim against Montgomery for failure to train the officers of the Indiana University of Pennsylvania police department. Accordingly, their claim against Montgomery fails.

. At his deposition, Petit stated he pled guilty to disorderly conduct and that he never appealed that "conviction.” Despite Petit’s characterization, the District Court and the parties state that Petit entered into the ARD program. As we discuss, under Heck, both a guilty plea and an ARD are sufficient to bar a subsequent § 1983 claim.

. The purpose of the ARD program is to rehabilitate offenders and promptly dispose of minor criminal charges. See Pa.Crim. R. 300-20 & Committee Introduction. The program targets first time offenders charged with minor crimes that appear receptive to treatment and rehabilitation. District attorneys administer the ARD program and have discretion whether to request the court to grant it for a given defendant. Commonwealth v. Armstrong, 495 Pa. 506, 434 A.2d 1205 (1981). Admission into ARD is not a right. Commonwealth v. Paul, 383 Pa.Super. 486, 557 A.2d 357, 358 (1989). But prosecutors do not have unbridled discretion whether to grant or deny the program. Commonwealth v. Lutz, 508 Pa. 297, 495 A.2d 928, 935 (1985). See generally Cain v. Darby Borough, 7 F.3d 377, 382 (3d Cir.1993) (en banc).

. In Cain v. Darby Borough, 7 F.3d 377 (3d Cir.1993), decided before Heck v. Humphrey, we examined the validity of coupling the ARD program with a mandatory release of civil rights claims. Under a policy of the Delaware County District Attorney’s Office, the District Attorney would not approve the ARD program unless the petitioner first agreed to a release of all civil rights claims against the arresting officers. In Cain, the petitioner agreed to this waiver, but after successfully completing the program, she brought a § 1983 suit against three municipalities, the respective police departments, and arresting officers. We held that the release agreement was unenforceable under Town of Newton v. Rumery, 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987). Under Rumery, an agreement releasing § 1983 claims would be unenforceable "if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement.” Id. at 392, 107 S.Ct. 1187. We held that the Delaware County blanket policy of requiring release of § 1983 claims failed Rumery because it did not "distinguish between frivolous and meritorious litigation,” indiscriminately curtailing both. We stated: ”[w]hile ARD was designed in part to promptly dispose of minor criminal charges, thus eliminating the need for costly and time-consuming criminal trials, it was never intended to dispose of civil rights claims.” But Cain was decided before Heck v. Humphrey and did not consider whether ARD was a favorable termination of the criminal charge sufficient to bring a § 1983 claim.

. See Nardini v. Hackett, 2001 WL 1175130, at *4 (E.D.Pa. Sept.19, 2001) (holding ARD program not a termination favorable to plaintiff for purposes of bringing a § 1983 malicious prosecution claim); Davis v. Chubb/Pac. Indem. Group, 493 F.Supp. 89, 92 (D.C.Pa. 1980) ("an A.R.D. disposition ... [is not] a favorable termination”); but see Williams v. Borough of Nonistown, 1995 WL 422684, at *1 n. 3 (E.D.Pa. July 11, 1995) (declining to dismiss § 1983 malicious prosecution claim where underlying criminal charge was resolved through ARD, noting "lack of Third Circuit authority on the issue”).

. Connecticut's “accelerated pretrial rehabilitation” program is similar to Pennsylvania's ARD program. Conn. Gen.Stat. Ann. § 54-56e (West Supp.1992). To earn dismissal of the charges and erasure of related records under Connecticut's program, the defendant must successfully complete a probationary period and pay to the court a one hundred dollar "participation fee.”

. The strongest factor supporting the contention that ARD is a favorable termination is that successful completion of the ARD program results in dismissal of the criminal *212 charge and expungement of the arrest record. See Pa. R.Crim. P. 319, 320. For the reasons noted, however, we believe the ARD program is not a favorable termination under Heck.

. The District Court suggested that even if Heck did not bar Petit’s claim, the First Amendment claim would fail nonetheless because videotaping does not constitute a protected First Amendment activity. But videotaping or photographing the police in the performance of their duties on public property may be a protected activity. See Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir.2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest.”). More generally, photography or videography that has a communicative or expressive purpose enjoys some First Amendment protection. See generally Bery v. City of New York, 97 F.3d 689 (2d Cir.1996) (holding that sale of art and photographs are protected activities); Porat v. Lincoln Towers Cmty. Assn, 2005 WL 646093, at *4 (S.D.N.Y. Mar.21, 2005) (noting that photography for more than mere aesthetic or recreational purposes enjoys some First Amendment protection); Baker v. City of New York, 2002 WL 31132880, at *5, 2002 U.S. Dist LEXIS 18100, at *19 (S.D.N.Y. Sept. 26, 2002) ("It is undisputed that [plaintiff's] street photography is First Amendment expression[.]”).