NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3186
_____

FRANK SUAREZ,
                                        Appellant
v.

CITY OF BAYONNE; TIMOTHY CAREY, Individually;
STEVEN RHODES, Individually;
JOHN DOES 1-8 (fictitious names, real names unknown)
_____

On Appeal from United States District Court
for the District of New Jersey
(D. NJ. No. 2-10-cv-04495)
District Judge: Faith S. Hochberg
_____

Argued April 8, 2014
Before:  FISHER and SCIRICA, *Circuit Judges*, and MARIANI,[*] *District Judge*.

(Filed: May 7, 2014 )

Peter J. Cresci, Esq.  **ARGUED**
Cresci Law Firm
P.O. Box 74
830 Avenue A
Bayonne, NJ 07002

Michael S. Doran, Esq.  **ARGUED**
Cammarata, Nulty & Garrigan

_____

    [*]The Honorable Robert D. Mariani, District Judge for the United States District
Court for the Middle District of Pennsylvania, sitting by designation.

1

549 Summit Avenue
Jersey City, NJ 07306

_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Plaintiff-Appellant Frank Suarez appeals the order of the United States District Court for the District of New Jersey granting summary judgment to Defendant-Appellees Detectives Timothy Carey and Steven Rhodes (collectively, "the Detectives") and the City of Bayonne, New Jersey ("the City," and with the Detectives, "Appellees"). We will reverse in part and affirm in part.

I.

A.

We write principally for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.

Responding to an anonymous tip that drug dealing was occurring in the vicinity, the Detectives, joined by Detective Wayne Grapstul, approached an address on East 11th Street in Bayonne on the evening of April 29, 2010. The parties dispute what happened when they arrived.

Suarez testified at his deposition that he was sitting on the steps of a house when the Detectives "pulled up[,] jumped out of their car and just started hitting" him. A340. He testified that the Detectives were in an unmarked police vehicle, that they did not

2

identify themselves as police, and that he did not flee from them. He testified that each Detective hit him about four times, that they tackled him to the ground and handcuffed him, and then continued to hit him. He identified his sole injury from this encounter as a scrape to his head that did not bleed. A witness named John Klumpp testified that he saw Suarez lying handcuffed on the ground while being punched and kicked by the Detectives. Another witness, Karen Koepke, testified that she saw Suarez run but that she could not see whether the police assaulted him because cars obstructed her view.

The Detectives dispute this characterization of the incident at East 11th Street. Rhodes testified that as they approached the address, he recognized Suarez from past encounters with police and "locked eyes" on him. A400. According to Rhodes, at that point Suarez removed a small bag of marijuana from his waistband, dropped it on the ground, and took off running east on 11th Street. Carey testified that he identified himself as a police officer and gave chase, tackling Suarez a short distance away. Rhodes stayed with the marijuana, which Grapstul collected.

Officer Chester Konopka responded to the incident and arrived on-scene at 6:04 p.m. Konopka placed Suarez in his patrol car a few minutes later and drove him to police headquarters, where Suarez was searched and placed in a holding cell. It appears from the record that Suarez was never read his *Miranda* rights. About thirty to forty minutes later, Suarez was taken to an office used by the narcotics group, where Rhodes told him that he would be searched again. The two sides once again diverge as to what happened next.

3

Suarez testified that when he got to the office, Rhodes told him to remove his shoes and his pants but did not remove his handcuffs, which bound his hands behind his back. Suarez claims that he was able to partially remove his pants despite being handcuffed, and that once he had done so Rhodes punched him in the nose, breaking it. He claims that Rhodes and Carey hit his body and head two more times each. He also claims they called him a racial epithet, and testified that he did not resist the search, attempt to fight back, or kick either officer.

The Detectives testified differently. They do not dispute that they took Suarez to the office for a second search, but the Detectives claim that they removed his handcuffs when he arrived at the office. Rhodes testified that Suarez resisted his efforts to perform a search, "became irate," and then "pushed [Rhodes], took a fighting stance and kicked [him] in the genital area" while still wearing his boots. A407. Rhodes claims that he then punched Suarez once in the face in self-defense, which caused Suarez to bleed from the nose. Rhodes claims to have hit Suarez only once, and asserts that Carey did not hit him at all.

After the scuffle at police headquarters, Suarez was taken to Bayonne Medical Center, where he was triaged at 7:03 p.m. He was diagnosed with a broken nose and skin abrasions to his arm. Hospital records indicate that Suarez described his pain as mild. Suarez was given ibuprofen and discharged into police custody. Suarez filed a complaint with the Bayonne Police Department Internal Affairs Unit alleging that the Detectives

4

engaged in an excessive use of force. After Suarez failed to appear for an interview in connection with his complaint, Internal Affairs deemed the Detectives exonerated.

Suarez was charged with a variety of offenses. In December 2012, he pleaded guilty in New Jersey municipal court to simple assault of Rhodes, and the remainder of the charges were dismissed pursuant to a plea agreement. At his plea hearing, the following colloquy occurred:

> Q: Mr. Suarez, I draw your attention to April 29, 2010. Do you recall being in the City of Bayonne on that date?
>
> A: Yes.
>
> Q: And were you arrested by an officer, Detective Rhodes?
>
> A: Yes.
>
> Q: And during that arrest, did you strike him and cause him pain?
>
> A: Yes.

A540. The court and Suarez then clarified that the assault occurred at the police headquarters, not on the street.

## B.

Suarez filed a three-count complaint on September 1, 2010, naming as defendants Carey, Rhodes, and the City. He brought claims against the detectives for unreasonable seizure, use of excessive force, and denial of medical care for injuries suffered while in custody. He alleged a municipal liability claim against the City.

On March 14, 2012, the District Court stayed proceedings in this case pending the outcome of the criminal charges against Suarez. Once he pleaded guilty, the District

Court dissolved the stay. Appellees moved for summary judgment on all counts, which the District Court granted. This timely appeal followed.

## II.[1]

"On an appeal from a grant or denial of summary judgment, our review is plenary and we apply the same test the district court should have utilized initially." *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009). A district court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "'might affect the outcome of the suit under the governing law.'" *In re Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). For a factual dispute to be genuine, "'all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 248-49).

## III.

## A.

The District Court held that Suarez's excessive force and unreasonable seizure claims amounted to a collateral attack on his simple assault conviction, and were

_____

[1] The District Court had federal question jurisdiction pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction over the District Court's final order granting summary judgment pursuant to 28 U.S.C. § 1291.

therefore barred by the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994). We disagree.

The Supreme Court held in *Heck* that a plaintiff may not maintain a claim under 42 U.S.C. § 1983 if success on such a claim would imply the invalidity of the plaintiff's criminal conviction, unless the conviction has already been reversed on appeal, invalidated through collateral proceedings, or expunged by executive order. *Id.* at 486-87. The reason for this rule "is to avoid parallel litigation of probable cause and guilt" as well as to "prevent[] the claimant from succeeding in a tort action after having been convicted in the underlying criminal prosecution, which would run counter to the judicial policy against creating two conflicting resolutions arising from the same transaction." *Gilles v. Davis*, 427 F.3d 197, 209 (3d Cir. 2005) (citing *Heck*, 512 U.S. at 484). We have recognized that *Heck* does not automatically bar a § 1983 claim for excessive force against an officer even though the plaintiff was convicted of resisting arrest (or, as here, simple assault) based on the same interaction with police. *Nelson v. Jashurek*, 109 F.3d 142, 145-46 (3d Cir. 1997). This is so because law enforcement officers can "effectuate[] a lawful arrest in an unlawful manner." *Id.*

It is important to separate, for purposes of our *Heck* analysis, Suarez's arrest on East 11th Street and the fracas at police headquarters. The District Court concluded that the East 11th Street incident "began the chain of events leading to [Suarez's] guilty plea for simple assault on Detective Rhodes," and therefore a verdict in Suarez's favor would undermine his conviction. A9. We disagree with this conclusion. If a jury were to credit

7

Suarez's version of the East 11th Street incident, that would not imply the invalidity of his simple assault conviction based on the incident at police headquarters. Under New Jersey law, Suarez would have been entitled to resist an unlawful use of force by the Detectives, but such a right would have dissipated once he had been taken into custody and the excessive use of force abated. *See State v. Mulvihill*, 270 A.2d 277, 280 (N.J. 1970) (holding that a citizen "cannot use greater force in protecting himself against the officer's unlawful force than reasonably appears to be necessary. If he employs such greater force, then he becomes the aggressor and forfeits the right to claim self-defense to a charge of assault and battery on the officer"). Even if the Detectives employed excessive force on East 11th Street, Suarez's right to resist would have expired by the time he was searched at police headquarters, and therefore he would still be guilty of simple assault. Hence, the claim is not barred by *Heck*.

The analysis is a bit more subtle with respect to the tussle at headquarters. Suarez pleaded guilty to kicking Rhodes in the groin while undergoing the second search. To the extent that Suarez claims either: (1) that he did not kick Rhodes at all and he was beaten wholly without provocation; or (2) that he used a reasonable amount of force when he kicked Rhodes after Rhodes attacked him, his claim is barred by *Heck*. With respect to the former, the reason is that such a theory would undermine the factual basis for his guilty plea insofar as he admitted to kicking Rhodes at his change of plea hearing. With respect to the latter, by pleading guilty to the criminal offense of simple assault, Suarez has conceded that he did not use reasonable force when he kicked Rhodes in response to

8

an excessive and unreasonable use of force.  *See Mulvihill*, 270 A.2d at 279 ("If . . . the officer employs excessive and unnecessary force, the citizen may respond or counter with the use of reasonable force to protect himself, and if in so doing the officer is injured no criminal offense has been committed.").

He testified at his deposition, however, that Carey hit him at least twice, on his head and in his ribs, and that Rhodes hit him more than once.  A344.  Suarez did not plead guilty to any conduct relating to Detective Carey, and thus if the jury were to credit Suarez's testimony and find that Carey used excessive force in restraining him, his conviction for assaulting Rhodes would not be undermined.  Similarly, if the jury found that Rhodes continued to beat Suarez beyond the point necessary to secure him after his brief resistance, the jury could return a verdict in Suarez's favor without undermining his assault conviction.

We conclude that the District Court erred in holding that Suarez's excessive force and unreasonable seizure claims are barred by *Heck*, and we will accordingly reverse the District Court's grant of summary judgment to the Detectives on these claims.

### B.

The District Court offered as alternative bases for granting summary judgment on Suarez's excessive force and unreasonable seizure claims: (1) that Suarez had failed to raise a genuine dispute of material fact on these claims; and (2) the Detectives were entitled to qualified immunity.  Both alternative holdings were limited to Suarez's claims as they relate to the East 11th Street incident; the District Court relied wholly on its *Heck*

9

analysis with respect to Suarez's claims as they relate to the incident at police headquarters. We will reverse on both grounds.

A police officer's "use of force contravenes the Fourth Amendment if it is excessive under objective standards of reasonableness." *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). We have described a variety of factors that are relevant to determining whether an officer's use of force is objectively reasonable, including:

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, . . . whether he is actively resisting arrest or attempting to evade arrest by flight[,] . . . the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

*Couden v. Duffy*, 446 F.3d 483, 496-97 (3d Cir. 2006) (final alteration in original; internal quotation marks and citations omitted).

Summary judgment is appropriate only when there are no genuinely disputed issues of material fact. When ruling on a motion for summary judgment, a district court "'may not . . . weigh the evidence or make credibility determinations' because 'these tasks are left for the fact finder.'" *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011) (quoting *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008)). The District Court's grant of summary judgment amounted to a determination that Suarez's deposition testimony was not credible and that the evidence in the Detectives' favor outweighed that in favor of Suarez, two determinations that it was not permitted to make at summary judgment. It relied on the deposition testimony of Rhodes and Carey that Suarez fled and

10

resisted arrest, and Koepke's testimony that Suarez ran from the Detectives, which it incorrectly credited as "the sworn testimony of his own mother." A9. It further disregarded Suarez's claim that the Detectives kicked and punched him unnecessarily by observing that his "only injury from the East 11th Street encounter was a scratch on his head." *Id.* But Suarez's testimony contradicts the Detectives' narrative. He claims that the Detectives assaulted him without warning or provocation, and that he did not resist or flee from them. He testified that he was punched and kicked in the head, ribs, and back about four times by each Detective, that he was handcuffed and then hit again. Were a jury to credit Suarez's testimony, they could reasonably find that the Detectives employed excessive force in light of the factors we have enunciated. Whether Suarez's testimony is worthy of credence is a question for the jury, not for the District Court on summary judgment.

The District Court's ruling on qualified immunity was likewise in error. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). As we have discussed, a material factual dispute exists as to whether the Detectives violated Suarez's right to be free from the use of excessive force and from unreasonable seizure. With respect to the "clearly established" prong of the qualified immunity question, "[t]he factors relevant to the excessive force analysis are well-recognized." *Couden*, 446 F.3d at 497. Were the jury to credit Suarez's testimony, that finding would support the

11

conclusion that the Detectives used excessive force under clearly established law. Accordingly, the District Court erred in concluding that the Detectives are entitled to qualified immunity.

C.

The District Court granted summary judgment to the Detectives on Suarez's failure to provide medical treatment claim. We will affirm.

In order to prevail on his failure to provide medical treatment claim, Suarez must show that: (1) the Detectives were deliberately indifferent to his medical needs; and (2) his medical needs were serious. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "Deliberate indifference may be shown by 'intentionally denying or delaying medical care.'" *Kearney*, 571 F.3d at 330 (quoting *Estelle*, 429 U.S. at 104). If a prisoner is subjected to an "'unnecessary and wanton infliction of pain . . . as a consequence of denial or delay in the provision of adequate medical care,'" that may rise to the level of a failure to treat a serious medical need. *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003) (some internal quotation marks omitted) (quoting *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).

The District Court correctly determined that Suarez failed to raise a genuine dispute of material fact in support of his failure to provide medical treatment claim. With respect to the East 11th Street incident, Suarez failed to identify any injury that would qualify as a "serious medical need." Rather, the only injury he claims to have suffered as

12

a result of that incident was a scrape to his left temple that did not bleed, and for which there is no evidence that he requested medical treatment. Nor is there evidence that Suarez suffered an "unnecessary and wanton infliction of pain" due to a failure to treat this minor abrasion. With respect to the injuries he sustained from the scuffle at police headquarters, Suarez has no evidence that the Detectives intentionally denied or delayed his access to medical care. He was taken to the Emergency Department at Bayonne Medical Center immediately following the kerfuffle. Suarez claims that it took the officers between forty-five minutes and an hour to arrive at the hospital, but elsewhere he testified that he sat in a holding cell at police headquarters for about half an hour before being taken to the narcotics room where the incident occurred. Suarez was taken into custody a few minutes after 6:00 p.m. and was triaged at Bayonne Hospital at 7:03 p.m. At most, he waited between thirty minutes and an hour before arriving at the hospital. Once there, he informed hospital staff that his injuries "hurt [a] little bit." A134. He was diagnosed with a nasal fracture and skin abrasions to his arm, given 600 milligrams of ibuprofen, and was discharged to police custody. There is simply no evidence that Suarez was subjected to an "unnecessary and wanton infliction of pain" due to a deliberate failure to provide him with medical treatment. Accordingly, we will affirm the District Court's grant of summary judgment on this claim.

## D.

The District Court granted summary judgment to the City on Suarez's municipal liability claim because it had previously found that there was no underlying constitutional

13

violation. This was error, for reasons we have discussed. However, it held in the alternative that even assuming the presence of a constitutional injury, Suarez had "adduced absolutely no evidence beyond mere legal conclusory language" that his injury was the result of a policy or custom of the City. A12. We agree and will affirm on this basis.

A municipality may be held liable under 42 U.S.C. § 1983 "'only . . . when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom.'" *Mulholland v. Gov't of the Cnty. of Berks, Pa.*, 706 F.3d 227, 237 (3d Cir. 2013) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)). For Suarez to establish the City's liability for either an unconstitutional policy or custom, "[i]t is clear . . . [that he] 'must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom.'" *Watson v. Abington Twp.*, 478 F.3d 144, 156 (3d Cir. 2007) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

Suarez's municipal liability claim boils down to three allegations: (1) that the City has a custom and practice of allowing officers to use excessive force; (2) that the City fails to properly investigate internal affairs complaints; and (3) that the City fails to properly train its officers in the use of force and the performance of *Terry* stops. He has failed to adduce evidence in support of any of these theories. With respect to his claim that the City has a custom or policy of allowing police officers "to head bang citizens

14

without recourse," Appellants' Br. at 40, Suarez lists in his brief several lawsuits that he claims show a custom of tolerance for such misbehavior. But he has failed to provide any evidence regarding the factual bases of these lawsuits or what their outcomes were. Nor has he provided any evidence whatsoever that the incidents giving rise to these lawsuits (assuming that they presented meritorious claims) derived from a custom or policy of the City to condone the use of excessive force. Similarly, Suarez's vague allegations that the City fails to properly investigate internal affairs complaints are supported by no evidence of such a policy or custom. Finally, with respect to his failure to train theory, Suarez's only evidence is deposition testimony that he has misconstrued in an attempt to manufacture a factual dispute.[2]

We agree with the District Court that Suarez has failed to raise a genuine dispute of material fact with respect to his municipal liability claim, and we will affirm its grant of summary judgment to the City.

---

[2] For example, Suarez claims that "[n]either individual Defendant knew what a *Terry* stop was in their vast experience," Appellants' Br. at 37, citing only the following deposition testimony as support:

Q: Detective Rhodes, do you know what a *Terry* stop is? Have you ever      heard of the term a *Terry* stop, T-e-r-r-y?
A. No. I heard of a *Terry* search.
Q: What is your understanding of a *Terry* search?
A: It's a search of the outer garments of the individual.

A411; *cf. Terry v. Ohio*, 392 U.S. 1, 30 (1968) (allowing a police officer, in appropriate circumstances, to "conduct a carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault" the officer). The rest of Suarez's evidence purporting to show the City's failure to train is similarly disingenuous and equally unavailing.

IV.

For the reasons discussed, we will reverse the District Court's order insofar as it granted summary judgment to the Detectives on Suarez's excessive force and unreasonable seizure claims, and remand for trial on these claims. We affirm in all other respects.