Susan STARTZELL; Nancy Major; James Cruse; Gerald Fennell; Randall Beckman; Linda Beckman; Michael Marcavage; Mark Diener; Dennis Green; Arlene Elshinnawy; Lauren Murch, a minor, by and through her parent and next friend, Beverly Murch, Appellants

v.

CITY OF PHILADELPHIA, PENNSYL-VANIA; Lynne Abraham, In Her Official Capacity as District Attorney for the City and County of Philadelphia; William V. Fisher, In His Official and Individual Capacity; James Tiano, In His Official and Individual Capacity; Karen Simmons, In Her Official And

Individual Capacity; Philly Pride Presents, Inc.; Charles F. Volz, Jr.; Fran Price; Donna Marcus, Assistant District Attorney; The Philadelphia District Attorney's Office.

No. 07–1461.

United States Court of Appeals,
Third Circuit.

Argued Feb. 11, 2008.

Filed: July 15, 2008.

Amanda L.H. Brinton, Lloyd T. Hoppe, Jr., (Argued), C. Scott Shields, Shields & Hoppe, Media, PA, Attorneys for Appellants.

Jane L. Istvan, (Argued), City of Philadelphia Law Department, Jeremy D. Frey, (Argued), Pepper Hamilton, Philadelphia, PA, Attorneys for Appellees.

Before: SLOVITER, SMITH, and STAPLETON, Circuit Judges.

OPINION OF THE COURT

SLOVITER, Circuit Judge.

The parties to the events surrounding the October 2004 OutFest have differing, indeed contrary, views of the protection that the First Amendment affords to organizers of events that generate counter-protests and the rights of those counter-protestors. Our task is to strike a balance between the rights of persons in those opposing positions, while at all times remaining true to the essence of the First Amendment.

The particular event that brings this issue before us was the October 10, 2004 OutFest, organized by Philly Pride Presents, Inc. ("Philly Pride") to celebrate "National Coming Out Day" on behalf of the lesbian, gay, bisexual, and transgendered community. The counter-protestors were members of Repent America led by Michael Marcavage, who entered the area assigned to OutFest with large signs, microphones, bullhorns, and musical instruments, seeking to proclaim their message that homosexuality is a sin. When the Marcavage group disobeyed a police directive to move to a less disruptive location, they were arrested. They then filed this suit, alleging federal and state law claims.

Before us is the appeal from the decision of the District Court granting the motions for summary judgment filed by defendants the City of Philadelphia, Police Captain William V. Fisher, Chief Inspector James Tiano, and Police Counsel Karen Simmons ("City," collectively),[1] and Philly Pride, Fran Price, Philly Pride's Executive Director, and Charles F. Volz, Jr., Philly Pride's volunteer OutFest Coordinator and

---

1. Plaintiffs/Appellants originally also named as defendants District Attorney Lynne Abraham, Assistant District Attorney Donna Mar- cus, and the Philadelphia District Attorney's Office, but voluntarily dismissed those defendants.

Senior Advisor ("Philly Pride," collectively).

# I.

## Background

### A. *Facts*

Appellants are eleven Christians affiliated with an organization known as Repent America, which was founded by Appellant Michael Marcavage in 2002.[2] Appellants believe that homosexuality is sinful and that "it is their duty to God to warn others about the destructiveness of sin through public proclamation of the gospel of Jesus Christ." App. II at 21. Appellants communicate their message through displaying signs, offering literature, and engaging in "open air preaching," which includes praying, singing, playing music, and talking to people about the Scriptures.

Philly Pride is a private, not-for-profit corporation that organizes lesbian, gay, bisexual, and transgendered ("LGBT") events, including Pride Day in June and OutFest in October. OutFest, an annual street festival organized by Philly Pride to celebrate "National Coming Out Day"[3] and to affirm LGBT identity, took place on October 10, 2004. Events similar to Out-Fest are held annually in approximately thirty cities. Philadelphia has the largest celebration, attracting over 30,000 people. OutFest is held in Philadelphia's "Gayborhood," bordered by Walnut and Pine Streets at its north and south borders and Quince Street (between 11th and 12th Streets) and Juniper Street (between 13th and Broad Streets) at its east and west borders. Philly Pride had obtained a per-

mit from the City of Philadelphia to close off the streets in which OutFest took place. The event included, inter alia, stages and dance areas, sport and amusement areas, a flea market, and paying vendors from various organizations. All the events were free and open to the public.

On prior occasions, specifically the SundayOut street festival on May 2, 2004 and the Philly Pride Parade on June 13, 2004, Appellants had attended gay pride events in order to express their anti-homosexual message. Because those events had been characterized by confrontations between the groups with opposing messages, Philly Pride anticipated that Appellants would seek to attend OutFest 2004, an anticipation supported by Marcavage's public announcement regarding OutFest. He was quoted in the Philadelphia Gay News as saying, "it's our hope that OutFest will come to an end." App. II at 89.

In advance of OutFest, Daniel Anders, counsel for Philly Pride, sent a letter to the Chief Deputy City Solicitor on September 15, 2004, in which he stated: "In a recent interview with the Philadelphia Gay News, Michael Marcavage of Repent America commented on Philly Pride's intention to keep Repent America out of the OutFest block party. Marcavage said, 'We do what God is calling us to do. If it means breaking the law, we will do that.' " App. II at 332. Anders requested that "the City uphold Philly Pride's First Amendment rights to determine and maintain the expressive content of its own event ... [by] keep[ing] anti-LGBT protestors from accessing the permitted city

---

**2.** The other ten Appellants are Susan Startzell, Nancy Major, James Cruise, Gerald Fennell, Randall Beckman, Linda Beckman, Mark Diener, Dennis Green, Arlene Elshinnawy, and Lauren Murch ("Appellants," collectively).

**3.** OutFest is held on the Sunday closest to October 11, which is National Coming Out Day.

blocks of the party during the hours specified on the permits issued" to Philly Pride. App. II at 330. Philly Pride made similar oral requests. The City rejected Philly Pride's request, because, as police counsel Karen Simmons explained in her deposition, "it's an open street event in the streets of Philadelphia and ... [Appellants] would be allowed in with their bull horns and with their signs and any way they want to come in, as long as they don't break any law...." App. II at 146.

After having its request to exclude Repent America from OutFest denied, Philly Pride informed the City that it intended to use volunteers to form a "human buffer" between anti-LGBT protestors and Out-Fest attendees. The volunteers ("Pink Angels"), wearing pink shirts, would blow whistles and carry large pink Styrofoam boards shaped like angels that would shield attendees from the signs carried by the protestors. The City took no position on the use of such a buffer, but told Philly Pride that it would make an on-site determination regarding the propriety and safety of such efforts.

On the morning of OutFest, October 10, 2004, Philadelphia Police Department's legal advisor, Karen Simmons, told police officers assigned to the event that they were there to protect everyone's First Amendment rights, including those of anti-LGBT protestors, and were to let the latter into the permitted area despite Philly Pride's requests to the contrary. The officers were also repeatedly told that, should any issue arise with respect to the protestors or the Pink Angels, they should not take any actions without first calling for supervision. Chief Tiano told the officers about Philly Pride's intention to create a human buffer zone through the use of the Pink Angels, which he commented could "cause a problem." Roll Call video.[4]

Appellants arrived at OutFest early in the afternoon of October 10, 2004, bringing with them bullhorns, large signs, literature, and the documentary film crew. *See supra* note 4. The signs displayed biblical messages, many of them proclaiming Appellants' view that homosexuality is a sin.[5] It is of interest that the District Court noted that Christian community groups supported OutFest as well as other Philly Pride events. Upon the arrival of Appellants, Philly Pride's Pink Angels linked arms together and formed a human barrier to prevent them from entering the event. Appellants complained to the police, and within a few minutes the police ordered the Philly Pride volunteers to move so that Appellants could enter Out-Fest, threatening the Philly Pride volunteers with arrest if they did not comply. As Appellants were allowed to enter the permitted area, Captain Fisher, the commanding officer of the Civil Affairs Unit, told Appellant Marcavage that "we don't want any silliness." App. II at 277. According to Captain Fisher, he meant that he did not want Marcavage "to get into a situation where I have to save him and he started getting beat up or something." App. II at 278.

Appellants entered OutFest at 13th and Locust Streets, and began to convey their message about twenty yards away from

---

4. Because Repent America was accompanied by a film crew and two resulting videotapes are in the record ("Roll Call" and "OutFest"), we have had the opportunity to view many of the incidents at issue here. The police roll call took place outdoors and was recorded on videotape.

5. Some of the signs read: "Christ Died to Save Sinners"; "Homosexuality is sin. Christ can set you free." *Startzell v. City of Philadelphia*, No. 05–05287, 2007 WL 172400, at *2 n. 4 (E.D.Pa. Jan.18, 2007); Supp.App. at 18.

the main stage, singing loudly, playing instruments, displaying large signs, and using microphones and bullhorns. The Pink Angels, who sought to prevent Appellants' preaching from being heard, surrounded them with their large Styrofoam signs and blow whistles. Once the musical program began on the main stage, Captain Fisher instructed Appellants to move farther up 13th Street so that they would not block the stage or interfere with its activities, noting that OutFest held a permit to hold a program on stage. Appellants then moved north for about one block on 13th Street toward Walnut Street, followed by the Pink Angels. At this point, Appellant Diener called a transgendered person a "she-man," saying through his bullhorn, "[t]he mirror lied to you this morning. Your shadow is showing." *Startzell v. City of Philadelphia*, No. 05–05287, 2007 WL 172400, at *3 (E.D.Pa. Jan. 18, 2007). The individual responded and Diener then warned, "[y]ou won't be preaching like this in hell, she-man." *Id.* Appellant Marcavage also told this individual that the problem was that "you are celebrating your sin. We're trying to celebrate Jesus." OutFest video.

Captain Fisher and legal counsel Simmons told Appellants, who had come to a standstill in the middle of the street, that they had to move again because there were complaints that they were blocking access to vendor booths. At this point, Appellants were surrounded by about forty to fifty other people, including the police and the Pink Angels. Appellants were instructed by Simmons, Captain Fisher, and Chief Tiano to move farther north on 13th Street to Walnut Street, near a popular gay bar named Woody's that was located within the OutFest permit area but at its perimeter. Marcavage refused to comply with the police order, saying "[w]e're not leaving the event," and directed his group to walk in the opposite direction, back toward the main stage area. OutFest video. The police warned him that refusal to follow their directions could lead to his arrest, but Marcavage refused to move. Chief Tiano then ordered the police to place Appellants under arrest for disorderly conduct, refusing to obey police orders, and related charges. Marcavage lay on the ground after being informed that he was under arrest. He declined the police order to stand and was lifted in a supine position by several police officers, and stood only after they arrived at the police vehicle. Appellants were arrested at approximately 1:30 p.m. and were incarcerated for twenty-one hours. All charges against them were ultimately dismissed.

## B. *Procedural History*

Appellants filed this lawsuit in the United States District Court for the Eastern District of Pennsylvania. The complaint alleged violations of 42 U.S.C. §§ 1983 and 1985(3), the Pennsylvania Constitution, and various state laws. Philly Pride filed a motion to dismiss the only two counts on which it was also named as defendant (conspiracy in violation of §§ 1983 and 1985(3)). The District Court denied its motion. Following the discovery period, Philly Pride and the City filed separate motions for summary judgment, and Appellants filed a cross-motion for partial summary judgment. On January 18, 2007, the District Court granted summary judgment in favor of Philly Pride and the City.

The Court rejected Appellants' First Amendment claim against the City, finding that the City did not prohibit Appellants' speech based on its content, but rather imposed reasonable time, place, or manner restrictions that were content neutral, narrowly tailored, and allowed for alternative channels of communication. The Court rejected Appellants' viewpoint-based discrimination and "heckler's veto" argu-

ments, and held that Philly Pride "had the right to exclude [Appellants] and their contrary message from [its] expressive, permitted event." *Startzell*, 2007 WL 172400, at *9. It based that holding on *Hurley v. Irish–Am. Gay, Lesbian, & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).

The District Court also granted summary judgment to the City on Appellants' First Amendment retaliation claim, which Appellants have not pursued in this appeal. The Court further granted summary judgment to the City on Appellants' Equal Protection claim of selective treatment, Fourth Amendment claims of unreasonable seizure, false arrest, and malicious prosecution stemming from Appellants' arrest, and claims brought pursuant to *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). With respect to the conspiracy claims against both groups of defendants, the Court found that Appellants had created no issue of material fact regarding the existence of any understanding or agreement between the City and Philly Pride to deprive Appellants of their First Amendment rights. Finally, the Court dismissed Appellants' claim for punitive damages against the individual officers.[6]

## II.

### Standard of Review

■ This court reviews the District Court's decision resolving cross-motions for summary judgment de novo. *Cantor v. Perelman*, 414 F.3d 430, 435 n. 2 (3d Cir. 2005). A grant of summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must view all evidence and draw all inferences in the light most favorable to the non-moving party, and summary judgment is appropriate only if there are no genuine issues of material fact. *Davis v. Mountaire Farms, Inc.*, 453 F.3d 554, 556 (3d Cir.2006).

## III.

### Discussion

A. *First Amendment Claim*

1. *General Principles*

■ Three considerations underlie any First Amendment analysis of a challenge that plaintiffs were excluded from an event: (1) whether the speech is "protected by the First Amendment"; (2) "the nature of the forum"; and (3) whether the government's "justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The first two considerations are not at issue in this case, as the parties do not dispute that Appellants' speech deserved constitutional protection and agree that OutFest took place in a public forum—the streets and sidewalks of Philadelphia. We turn therefore to the City's justifications for the events at issue.

The Supreme Court has frequently declared that the very core of the First Amendment is that the government cannot regulate speech "because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). It explained that "[i]f the marketplace of ideas is to remain free and

---

6. We have jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from a final order disposing of all claims regarding all parties.

open, governments must not be allowed to choose 'which issues are worth discussing or debating....'" *Consol. Edison Co. of N.Y., Inc. v. Public Serv. Comm'n,* 447 U.S. 530, 537–38, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (citation omitted). In considering the extent to which the government may restrict or regulate expressive activity in a public forum, a distinction must be drawn between content-based and content-neutral regulations.

■■■■ "[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Content-based restrictions on speech are "presumptively invalid." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). They are subject to the "most exacting scrutiny," *Turner,* 512 U.S. at 642, 114 S.Ct. 2445, because they "pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion," *id.* at 641, 114 S.Ct. 2445.

■■■■ "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.... Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819,

829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). As Justice Brennan wrote, "[v]iewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'" *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 62, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (Brennan, J., dissenting).

■■■■ To justify a content-based restriction, the government must show that the regulation or restriction is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Id.* at 45, 103 S.Ct. 948. By contrast, restrictions on speech that are viewpoint neutral and subject-matter neutral may permissibly regulate the time, place, or manner of expression if they are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Id.*

### 2. *Whether Philly Pride had a Right to Exclude*

It has been Philly Pride's position that because it had a city permit to conduct OutFest, it had a correlative right to exclude from the OutFest event those who hold contrary, indeed antagonistic, viewpoints. There is language in the District Court's opinion that supports that position. Thus, for example, the Court stated, "[o]nce the City issued a permit to Philly Pride for OutFest, it was empowered to enforce the permit by excluding persons expressing contrary messages." *Startzell,* 2007 WL 172400, at *6. The authorities cited by the District Court do not support that broad proposition.[7] Nor does the Su-

---

7. In both *Sistrunk v. City of Strongsville,* 99 F.3d 194 (6th Cir.1996), and *Schwitzgebel v. City of Strongsville,* 898 F.Supp. 1208

(N.D.Ohio 1995), the events (Bush–Quayle campaign rallies) were not open to the gener-

preme Court opinion relied on by all parties. My colleague in his concurrence suggests that we believe that "the police in effect issued an exclusive permit to the OutFest supporters . . . ." As we make clear hereafter, that is not the holding of this opinion.

In *Hurley v. Irish–Am. Gay, Lesbian, & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), the Massachusetts state courts had interpreted the state's public accommodation law to require the South Boston Allied War Veterans Council, a private group that annually organized the Boston St. Patrick's Day parade, to include among the marchers a contingent from an organization of openly gay, lesbian and bisexual individuals of Irish heritage ("GLIB"). The Supreme Court, in a unanimous opinion, held that the state Supreme Judicial Court's decision violated the parade organizers' First Amendment right of autonomy, the right to control one's own speech. The Court held that the First Amendment protected the Council's decision "to exclude a message it did not like from the communication it chose to make . . . ." *Id.* at 574, 115 S.Ct. 2338. The Court held that to compel the organizers of the parade to include GLIB, or any other group that expressed a message the organizers did not agree with, would be "essentially requiring [them] to alter the expressive content of their parade." *Id.* at 572–73, 115 S.Ct. 2338. Such a requirement would violate "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573, 115 S.Ct. 2338.

*Hurley* does not control the case before us. The *Hurley* Court disallowed compelled, participatory speech, noting that "like a composer, the [parade organizers]

select[ ] the expressive units of the parade from potential participants, and though the score may not produce a particularized message, each contingent's expression in [their] eyes comports with what merits celebration on that day." *Id.* at 574, 115 S.Ct. 2338.

*Hurley* is as distinguishable from the situation presented here as was the decision in *Turner*, 512 U.S. at 622, 114 S.Ct. 2445, from *Hurley*. As the *Hurley* Court noted, *Turner* upheld regulations that required cable operators to set aside channels for designated broadcast signals because cable had long served as a conduit for broadcast signals, and there was little risk that cable viewers would assume that the cable operator endorsed the ideas or messages carried on the broadcast stations. *Hurley*, 515 U.S. at 575–76, 115 S.Ct. 2338.

The situation in *Hurley* would be comparable to that presented here if Repent America had sought a stage area or a vendor booth, because such participation in OutFest "would likely be perceived as having resulted from [Philly Pride's] customary determination about a unit admitted to [participate in OutFest's activities], that its message was worthy of presentation and quite possibly of support as well." *Id.* at 575, 115 S.Ct. 2338. However, that is not the issue in this case. Instead, the question presented is whether *Hurley* authorizes exclusion of Appellants from attending OutFest, a private-sponsored event in a public forum that was free and open to the general public. We hold that it does not.

Although the *Hurley* parade took place on a public thoroughfare, nothing in the opinion suggests that GLIB could be excluded from the streets after the parade had passed. To the contrary, the Court

al public but required attendees to obtain admission tickets.

noted that GLIB was free to seek its own parade permit. *Id.* at 578, 115 S.Ct. 2338. There is no basis to read *Hurley* as circumscribing the long line of authority upholding free access by the general public to street festivals and other events held in traditional public fora.

In *Hague v. C.I.O.*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), Justice Owen J. Roberts wrote, streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." That principle has been reiterated in case after case, *see, e.g., Frisby v. Schultz*, 487 U.S. 474, 481, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988); *Perry*, 460 U.S. at 45, 103 S.Ct. 948; *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), and neither the grant of a permit nor anything in *Hurley* alters that still viable principle.

Those of our sister circuits that have had occasion to consider the issue agree. The Court of Appeals for the Ninth Circuit held that a municipal policy that allowed permit-holders sponsoring an event in a public forum to exclude individuals who express messages with which the permit-holder disagrees was inconsistent with the First Amendment. *See Gathright v. City of Portland*, 439 F.3d 573, 575–76 (9th Cir.2006). The court held that the city could not enjoin an evangelical Christian from wearing signs or passing out pamphlets at a permitted event in a public location. It rejected the city's argument that *Hurley* allowed such exclusion, noting that the plaintiff sought "only to be heard,

not to have his speech included or possibly confused with another's...." *Id.* at 578. The court held that the city's policy was not a reasonable time, place, or manner regulation of public space, because—even assuming it was content neutral and was supported by a significant government interest—"the policy of allowing permittees unfettered discretion to exclude private citizens on any (or no) basis is not narrowly tailored to the City's legitimate interest in protecting its permittees' right under *Hurley*." *Id.* at 577.

Similarly, in *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir.2005), the court held that the city could not prevent plaintiff, who attended a permitted Arts Festival, from walking through the Festival grounds wearing a sign bearing a religious message. The court distinguished *Hurley* on the basis that Parks, like Gathright, "d[id] not seek inclusion in the speech of another group ... [but] was merely another attendee" of a permitted event open to the public, in a traditional public forum. *Id.* at 651; *see also Mahoney v. Babbitt*, 105 F.3d 1452, 1456 (D.C.Cir.1997) (refusing to extend *Hurley* to allow parade organizers to exclude people wishing to stand along parade route holding protest signs); *cf. Wickersham v. City of Columbia*, 481 F.3d 591, 600 (8th Cir.2007) (reasoning that *Hurley* did not apply to state actor who organized air show where it "has not shown that its message was dependent upon the composition of the crowd at the air show" or that appellants' signs and leaflets were likely to be identified with it).

As the court stated in *Parks*,[8] Parks only sought to exercise his First Amend-

---

8. The court distinguished its earlier decision in *Sistrunk*, 99 F.3d at 196, 200, which had rejected plaintiff's content-based discrimination claim where she was excluded from expressing her pro-Clinton views at a permitted, pro-Bush rally, because the Republican organization was engaging in collective, expressive activity and the permit it had received provided a specific use and was limited to members of the Republican organization and invitees, who were required to obtain admission tickets in order to attend the rally.

ment rights on streets which "remained a traditional public forum notwithstanding the special permit that was issued to the Arts Council." *Id.* at 652. The city cannot "claim that one's constitutionally protected rights disappear [where] a private party is hosting an event that remained free and open to the public." *Id.* The court then proceeded to conduct a traditional public forum analysis to hold that Parks' removal from the permitted area was an unconstitutional content-based restriction, because he was peacefully present at the Arts Festival but was asked to leave for no other reason than that the event sponsor wanted him removed. *Id.* at 654–55.

■ We agree with this line of cases. It follows that the District Court erred in extending *Hurley* to allow Philly Pride to exclude Appellants from the public streets occupied by OutFest. Appellants were dissenting speakers on the Philadelphia streets and sidewalks where OutFest took place. There was no danger of confusion that Appellants' speech would be confused with the message intended by Philly Pride. *See Mahoney*, 105 F.3d at 1456–57. Thus, Appellants were not infringing on Philly Pride's fundamental right under the First Amendment to have "the autonomy to choose the content of [its] own message." *Hurley*, 515 U.S. at 573, 115 S.Ct. 2338.

■ Furthermore, like the Arts Festival in *Parks,* OutFest took place in the streets and sidewalks of Philadelphia, an undisputed quintessential public forum. The issuance of a permit to use this public forum does not transform its status as a public forum. *Parks*, 395 F.3d at 652; *see also Grace*, 461 U.S. at 180, 103 S.Ct. 1702 (stating that government "may not by its own *ipse dixit* destroy the 'public forum' status of streets and parks which have historically been public forums") (citation and internal quotations omitted). "In

places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed." *Perry*, 460 U.S. at 45, 103 S.Ct. 948; *see also Frisby*, 487 U.S. at 480, 108 S.Ct. 2495 (noting that "public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum"). In such traditional public fora the state may not prohibit all communicative activity. *Perry*, 460 U.S. at 45, 103 S.Ct. 948. Indeed, "[s]treets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." *Carey v. Brown*, 447 U.S. 455, 460, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (citations and internal quotations omitted).

### 3. *Justifications for the City's Actions*

■ Although we believe some of the language in the District Court's opinion cannot be supported, it does not follow that its holding was erroneous. As the Supreme Court has stated, "[t]he principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction." *Poulos v. New Hampshire*, 345 U.S. 395, 405, 73 S.Ct. 760, 97 L.Ed. 1105 (1953). Indeed, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799–800, 105 S.Ct. 3439. Therefore, although the ability of the state to limit expressive

activity in a traditional public forum is "sharply circumscribed," *Perry,* 460 U.S. at 45, 103 S.Ct. 948, the state remains free to take action to maintain public order. It follows that although Appellants cannot be excluded from the streets and sidewalks of Philadelphia where OutFest took place, they are not free to proceed as they like through the permit area.

 Even in a traditional public forum, the government may impose content-neutral time, place, or manner restrictions provided that the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (citation and internal quotations omitted). Thus, the City had the authority to regulate Appellants' First Amendment activities where necessary. *See Wickersham,* 481 F.3d at 601 ("[Air show organizer-state actor] remains free to take reasonable steps to ensure that its air show message would not be submerged by any alternate forms of speech which prove to be unduly intrusive in their timing, place, or manner of expression.").

### a. Content Neutrality

 To determine if a restriction is content neutral, "[t]he principal inquiry ..., in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746. It is the government's purpose that controls. *Id.* A regulation is deemed content neutral if it serves purposes unrelated to the content of speech, regardless of whether it

incidentally affects certain speakers or messages and not others. *Id.* That is, government regulation of speech is properly regarded as content neutral if it is *"justified* without reference to the content of the regulated speech." *Id.* (citation and internal quotations omitted) (emphasis in original).

 The District Court rejected Appellants' argument that the police officers acted primarily because of concern with the crowd's reaction to their message, finding instead that "the response to the plaintiffs was a response to context, not content[, which] context developed from the City's issuing of a valid permit to Philly Pride." *Startzell,* 2007 WL 172400, at *6. A state or municipality has the right to regulate the use of city streets "to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly." *Cox v. Louisiana,* 379 U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.

*Id.; see also Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 387, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) ("[T]he right of free speech ... does not embrace a right to snuff out the free speech of others."). Thus, for instance, a municipality can control the use of its public streets for parades or processions, and it has similar authority "to give consideration, without unfair discrimination, to time, place and manner in relation to the other proper

uses of the streets." *Cox v. New Hampshire,* 312 U.S. 569, 576, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

■■■■ The Supreme Court has recognized permitting schemes as a content-neutral means for the government "to regulate competing uses of public forums." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (noting that "any permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication"); *see also Kroll v. U.S. Capitol Police,* 847 F.2d 899, 903 (D.C.Cir.1988) ("Permit systems are the embodiment of time, place, and manner restrictions that have long enjoyed the approbation of the Supreme Court."). Permits allow the government to arrange a public forum "so that individuals and groups can be heard in an orderly and appropriate manner," and *"enforcement* of a permit system inevitably requires taking cognizance of content." *Kroll,* 847 F.2d at 903 (emphasis in original). The principle of content neutrality does not divest police officers of the ability to enforce valid permits and to ensure that permitted speech is allowed to take place.

Although *Kroll* involved a qualified immunity claim, and is therefore not directly on point, it is nevertheless instructive on the treatment of permits in the First Amendment context. *Kroll* involved a permit to hold a welcoming ceremony for the Olympic Torch Relay Team on the steps of the United States Capitol Building.[9] *Id.* at 900. Relevant to our purposes, the Court

of Appeals for the District of Columbia explained that "[t]he principle of content neutrality does not ... mean that a permit system exists only as an office operation without enforcement capability." *Id.* at 903. Different courts have adopted different methods to deal with counter-protestors. *See, e.g., Olivieri v. Ward,* 801 F.2d 602, 607 (2d Cir.1986) (allotting opposing demonstrators thirty minutes within barricaded enclosure at different times to avoid confrontation between groups). We are not presented with that issue here.

Appellants do not challenge the permitting scheme in and of itself as being an unconstitutional restriction of their speech. Rather, Appellants urge us to disregard Philly Pride's permit to hold OutFest because they believe the non-exclusive permit did not give the police the right to restrict their speech. We have already made clear that Appellants possess a First Amendment right to communicate their message in a public forum. Yet, their rights are not superior to the First Amendment rights of Philly Pride, as permit-holder, to effectively convey the message of its event—"that we're out and proud of who we are," App. II at 309—and of the audience's ability to receive that message and experience the entire event.

■■■■ The right of free speech does not encompass the right to cause disruption, and that is particularly true when those claiming protection of the First Amendment cause actual disruption of an event covered by a permit. The City has an interest in ensuring that a permit-holder can use the permit for the purpose for which it was obtained. This interest nec-

---

9. The court found that reasonable police officers could have construed a Senate resolution authorizing the welcoming ceremony as a permit that allowed them to instruct a person holding an anti-Olympics sign to remove it while not instructing those holding pro-Olym-

pics signs to do the same. *Kroll,* 847 F.2d at 902. We need not comment on that holding because we are citing *Kroll* only for the limited purpose of explaining how the enforcement of appropriate permitting schemes comports with the principle of content neutrality.

essarily includes the right of police officers to prevent counter-protestors from disrupting or interfering with the message of the permit-holder. Thus, when protestors move from distributing literature and wearing signs to disruption of the permitted activities, the existence of a permit tilts the balance in favor of the permit-holders.

 In the case before us, the video shows that the Repent America contingent used bullhorns and microphones in an attempt to drown out the platform speakers and then, most significantly, congregated in the middle of the walkway. The police had ample justification to direct Appellants to move when they interfered with the permitted event's activities by expressing their message with loud bullhorns right next to the main stage where musical performances were held,[10] directly confronting a transgendered individual,[11] and blocking access to the vendors who had applied for booths at OutFest. The police action was not based on the content of Appellants' message but on their conduct. *See Kroll,* 847 F.2d at 903.

Appellants' conduct was different in kind and degree from that in *Parks,* where a demonstrator was removed from a nonexclusive Arts Festival which had a permit. 395 F.3d at 646. The court in *Parks* found that the city's actions were based on the content of the demonstrator's speech, as "Parks was acting in a peaceful manner and the only difference between him and the other patrons was that he wore a sign communicating a religious message and distributed religious leaflets." *Id.* at 653–54. There was no evidence that Parks was interfering with or disrupting any part of the Arts Festival; he was asked to move simply because the event sponsor did not want him there. *Id.* at 654. The court stated, "under these circumstances we find it difficult to conceive that Parks's removal was based on something other than the content of his speech." *Id.*

As we noted earlier, here, by contrast, Appellants did not simply carry their signs or distribute leaflets but used loud bullhorns to express their message near the stage area, directly addressed an OutFest attendee in a confrontational manner, and blocked access to the vendor booths. Because Appellants were interfering with the permitted event's message, something the other OutFest attendees were not doing, *see Wickersham,* 481 F.3d at 601, the police officers were justified in directing Appellants' movement away from the stage and the vendors. We take this occasion to note favorably the restraint with which the police acted, action we could observe from the videos.

**10.** We note the general proposition that amplified speech, such as through the use of bullhorns, is protected expression. *See Stokes v. City of Madison,* 930 F.2d 1163, 1168–69 (7th Cir.1991). However, "[r]egulation of sound and noise, especially when competing values are threatened, has long been a recognized government interest." *Id.* at 1170; *see also Ward,* 491 U.S. at 803, 109 S.Ct. 2746 (upholding regulation of volume of amplified music at bandshell in New York City's Central Park as "a reasonable regulation of the place and manner of expression").

**11.** The City argues that Appellant Diener's insulting statements to the transgendered individual were unprotected fighting words, citing *Gilles v. Davis,* 427 F.3d 197, 205 (3d Cir.2005). In *Gilles,* we found that part of Gilles' speech—epithets directed at a Christian-lesbian woman—constituted fighting words, and stated that "[w]here part of speech constitutes fighting words, the police may arrest for disorderly conduct even though other parts of the speech may be less provocative." *Id.* We need not decide whether this would provide an alternate basis for justifying Diener's arrest if we considered his comments to be fighting words, because we decide this case on other grounds.

Appellants argue that the police officers improperly used a "heckler's veto" by restricting their movement based on the audience's reaction to their message. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *see also Boos v. Barry,* 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) ("[I]n public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.") (citations and internal quotation marks omitted). A heckler's veto is an impermissible content-based restriction on speech where the speech is prohibited due to an anticipated disorderly or violent reaction of the audience. *See Brown v. Louisiana,* 383 U.S. 131, 133 n. 1, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); *see also Forsyth County,* 505 U.S. at 134–35, 112 S.Ct. 2395 (invalidating ordinance allowing administrator to adjust parade permit fees based on anticipated hostility to speech and concomitant higher cost of security).

The District Court found that the heckler's veto jurisprudence was "inapposite because it concerns government censorship that completely prohibits speech before it is made based on anticipated listener reaction to the speech." *Startzell,* 2007 WL 172400, at *8. Although we agree with Appellants that the heckler's veto analysis is not so limited but may apply to situations where police restrict speech that is taking place, *see, e.g., Terminiello v. City of Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *Frye v. Kansas City Police Dep't,* 375 F.3d 785 (8th Cir.2004), the more germane question is whether the City's actions were based on the content of the speech. *See Ward,* 491 U.S. at 791, 109 S.Ct. 2746. There is no evidence that they were. It is apparent that the police understood Appellants had rights under the First Amendment to express their message, but in directing Appellants to move to another location within OutFest they were merely imposing a content-neutral time, place, or manner restriction. Captain Fisher testified as to his motive as follows: "as a sworn police officer, I have a duty to protect life and property, and it's a case where there's times there has to be some degree of separation for the safety and welfare of everybody concerned." App. II at 282. Chief Tiano explained that "the significant part" of the reason he wanted Appellants to move was because they were blocking the vendors. App. II at 239. Although he admitted there was "a potential" for the crowd to get hostile based on Appellants' message, App. II at 239, the undisputed evidence shows Appellants, with the Pink Angels surrounding them, had attracted a crowd that was blocking access to the vendor booths. As Chief Tiano explained, he asked Appellants and not the Pink Angels to move because "I knew if they would move, I wouldn't have to worry about the other group. They'd move to[o]." App. II at 237. There is no evidence to suggest that the police direction to Appellants to move to a different location was based on content or viewpoint.[12]

12. Appellants cite to *Ovadal v. City of Madison,* 416 F.3d 531, 533–34 (7th Cir.2005), in which Christian protestors who held large signs above the sides of a pedestrian overpass spanning a busy highway were forced to leave under threat of arrest because drivers were disturbed by the signs. The court reversed a grant of summary judgment because genuine issues of material fact remained as to whether the police had imposed a heckler's veto, as

Appellants rely on certain testimony to support their argument; however, the cited testimony does not lead to the conclusion that the City's actions were content based. In the context of OutFest, which had received a permit to hold its event and engage vendors to sell their wares, the fact that the police asked Appellants rather than the Pink Angels to move was a content-neutral response to the interference caused by Appellants' actions and loud speech with the permitted event's activities. *See Kroll,* 847 F.2d at 903 ("*[E]n-forcement* of a permit system inevitably requires taking cognizance of content. Otherwise ... it would be impossible to separate non-permitted activity from activity that did enjoy the authorization conferred by a permit.") (emphasis in original). "Preclusion of a message is the evil at which the content-neutrality principle is aimed, not arrangements of a public forum so that individuals and groups can be heard in an orderly and appropriate manner." *Id.*

b. Narrow Tailoring

Having decided that the content-neutral analysis is appropriate, we must consider whether the restriction on Appellants' speech was narrowly tailored to serve a significant government interest, and whether it left open ample alternative channels of communication. *See Ward,* 491 U.S. at 791, 109 S.Ct. 2746. The burden is on the City to demonstrate the constitutionality of its actions. Although the District Court incorrectly placed that burden on Appellants, that error was without consequence. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 658, 101 S.Ct. 2559, 69 L.Ed.2d

298 (1981) (Brennan, J., concurring in part and dissenting in part) ("As our cases have long noted, once a governmental regulation is shown to impinge upon basic First Amendment rights, the burden falls on the government to show the validity of its asserted interest and the absence of less intrusive alternatives."); *N.J. Citizen Action v. Edison Twp.,* 797 F.2d 1250, 1255 (3d Cir.1986) ("Ordinarily, when a statute or other government action is alleged to infringe on the exercise of First Amendment rights, the state or municipality bears the burden of demonstrating the constitutionality of the action.").

Appellants do not appear to question the legitimacy of the City's interests—to ensure public order and safety and to ensure that OutFest's permit to engage in its speech activities is respected. "As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron,* 452 U.S. at 650, 101 S.Ct. 2559; *see also Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 768, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (recognizing the state "has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks").

 Instead, Appellants challenge the restrictions to their movement, arguing that they were not narrowly tailored because they resulted in their complete removal from the event area. The Supreme Court has stated that "restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" *Ward,* 491

"[t]he officers are permitted to decide on an ad hoc basis whether to allow the protest to continue depending on how drivers react to the signs on the pedestrian overpass." *Id.* at 537. *Ovadal* is distinguishable because here

there is undisputed evidence that the police did not interrupt Appellants' speech until they disobeyed a police order to move in order to allow access to vendor booths, leading to their arrest.

U.S. at 797, 109 S.Ct. 2746 (citation omitted). There is no need to determine if the restrictions are the least intrusive, but only whether the regulation " 'promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *Id.* at 799, 109 S.Ct. 2746 (citation omitted). " 'The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests' or the degree to which those interests should be promoted." *Id.* at 800, 109 S.Ct. 2746 (citation omitted).

■ The City's actions in this case were narrowly tailored to serve its significant interests. As the District Court found, the City did not exclude Appellants from OutFest but instead went "out of its way to grant [them] access," *Startzell,* 2007 WL 172400, at *7, and let them move about freely "until plaintiffs insulted individual attendees, blocked access to vendors, and disobeyed direct orders from the police, who were trying to preserve order and keep the peace." *Id.* Although Appellants' arrest ultimately silenced their speech, the police did not initially ban Appellants' speech; they were arrested only after they disobeyed police orders to move in a specified direction.

### c. Alternative Channels of Communication

■ The final factor to be considered in determining whether the City's actions were valid time, place, or manner restrictions is whether there were alternative avenues for the expression of Appellants' protected speech. *See Ward,* 491 U.S. at 802, 109 S.Ct. 2746. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be de-

sired." *Heffron,* 452 U.S. at 647, 101 S.Ct. 2559. Restrictions have been upheld, for example, when the challenged regulation neither prevents access outside of nor within the forum in question. *Id.* at 654–55, 101 S.Ct. 2559. Until their arrest, Appellants had alternative ways to express themselves without causing disruption, such as through the use of smaller signs without bullhorns so that the performances on the stages would not be obscured, the distribution of leaflets and counter-information without making derogatory comments, and the ability to move along with the crowd to express their message while avoiding standing still and blocking access to the vendors.

■ Although "[a]n alternative is not ample if the speaker is not permitted to reach the 'intended audience,' " *Bay Area Peace Navy v. United States,* 914 F.2d 1224, 1229 (9th Cir.1990) (citation omitted), that is not what occurred here. Admittedly, Appellants' intended audience was the LGBT OutFest attendees, whom they wanted to instruct about what they believed were the sins of homosexuality. The police officers' direction that Appellants move to a less congested area, albeit still within OutFest, may have reduced their potential audience. Nonetheless, Appellants have not demonstrated that the avenues that remained were inadequate. *See Ward,* 491 U.S. at 802, 109 S.Ct. 2746 ("That the city's limitations on volume may reduce to some degree the potential audience for respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate.").

Appellants complain that they were told to move to one specific area of OutFest; however, the Supreme Court rejected a similar argument in *Heffron,* where members of the Krishna religion were required at a state fair to confine the distribution

and sale of their religious literature and the solicitation of donations to a fixed location. 452 U.S. at 648, 654, 101 S.Ct. 2559. The Court upheld that requirement as a valid time, place, or manner regulation, as it did not "deny [the Krishnas] the right to conduct any desired activity at some point within the forum" and provided for adequate means to distribute and solicit from a location on the fairgrounds. *Id.* at 655, 101 S.Ct. 2559. Here, too, there is no showing that Appellants were unnecessarily limited in conveying their message from the location to which they were ordered to move, which was only about one-and-one-half blocks from OutFest's epicenter and near Philadelphia's biggest gay bar, a popular event location.

Appellants cite to *Mahoney v. Babbitt,* 105 F.3d 1452, 1459 (D.C.Cir.1997), where the court held that the government's grant of permits to protest in two other areas not along President Clinton's inaugural parade route did not provide an adequate alternative channel of communication because "it cannot rightly be said that all forums are equal." Here, however, even if Appellants' message would have been somewhat less effective if expressed outside OutFest, Appellants were not moved outside of OutFest and the record shows that ample avenues of communication remained available for them to preach within the boundaries of OutFest had they followed the police directions.[13]

Therefore, we hold that the City's actions in restricting Appellants' movement when they were interfering with or disrupting the speech of the permitted event were justified, reasonable, content-neutral regulations of the time, place, or manner of their expression.

**B. *Equal Protection Claim***

 Appellants raise additional claims but they can be disposed of easily. They claim that they were denied equal protection of the law because their movements at OutFest were restricted whereas the movements of the Philly Pride Pink Angels were not, an issue we alluded to above. An essential element of a claim of selective treatment under the Equal Protection Clause is that the comparable parties were "similarly situated." *Hill v. City of Scranton,* 411 F.3d 118, 125 (3d Cir. 2005) (citation omitted). Persons are similarly situated under the Equal Protection Clause when they are alike "in all relevant aspects." *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).

The District Court held that Appellants were not similarly situated to the Philly Pride volunteers because the volunteers were there as part of a permitted event that celebrated National Coming Out Day rather than as attendees with no relationship to the organizers whatsoever. Moreover, even were they similarly situated, the undisputed evidence demonstrates that the police compelled the Pink Angels to disperse their human barricade and let Appellants enter OutFest under threat of arrest. Unlike Appellants, the Pink Angels complied and therefore were not arrested for disobeying police orders.

**C. *Fourth Amendment Claims***

Appellants asserted claims against the City of false arrest and malicious prosecu-

---

**13.** Appellants also cite to *United States v. Grace,* 461 U.S. 171, 181–82, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), in which the Supreme Court rejected the government's argument that the speakers maintained the ability to express their message on sidewalks across the street from the Supreme Court building. That case involved a total ban on specified communicative activity on the public sidewalks surrounding the Supreme Court building. *Id.* Here, Appellants had opportunities to speak throughout their time at OutFest and were not silenced until they disobeyed a police order.

tion arising from their arrest on October 10, 2004. The District Court granted summary judgment to the City because Appellants failed to show lack of probable cause, a necessary element of a false arrest and malicious prosecution claim. *See Johnson v. Knorr*, 477 F.3d 75, 84–85 (3d Cir.2007) (false arrest); *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir.2005) (malicious prosecution). The District Court found that the police had probable cause to arrest Appellants for disorderly conduct, failure to disperse, and obstructing a highway.

 Under Pennsylvania law, a person is guilty of disorderly conduct if s/he "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, . . . (1) engages in fighting or threatening, or in violent or tumultuous behavior; (2) makes unreasonable noise; (3) uses obscene language, or makes an obscene gesture; or (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 Pa. Cons.Stat. Ann. § 5503. Whether a person's "words or acts rise to the level of disorderly conduct hinges upon whether they cause or unjustifiably risk a public disturbance." *Commonwealth v. Hock*, 556 Pa. 409, 728 A.2d 943, 946 (1999). The District Court found there was probable cause to arrest Appellants for disorderly conduct.

 Appellants argue that the Pennsylvania disorderly conduct statute may not be used against persons engaging in free speech. However, the First Amendment is not an absolute shield against a disorderly conduct charge. *See Common-*

*wealth v. Gowan*, 399 Pa.Super. 477, 582 A.2d 879, 881 (1990) ("It is uncontrovertible that the exercise of free speech can go beyond constitutionally protected boundaries to the realm of prohibited and criminal behavior."). Moreover, although speech may be protected, Appellants' choice to disobey police orders is not. Therefore, summary judgment was properly granted on Appellants' Fourth Amendment claims.[14]

### D. *Municipal Liability*

 Appellants argue that the District Court improperly granted summary judgment in favor of the City on their claims that the City had a custom or policy and/or failed to train or supervise its police officers such that Appellants were deprived of their constitutional rights. In *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that "municipalities and other local government units [are] included among those persons to whom § 1983 applies." For § 1983 liability to attach, Appellants must show that the City was responsible for any constitutional violations. *Collins v. City of Harker Heights*, 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Accordingly, "for there to be municipal liability, there . . . must be a violation of the [Appellants'] constitutional rights." *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir.2003). Because we have found that there was no violation of Appellants' constitutional rights, we need not reach the claim against the City under *Monell.* It too was properly dismissed.

**14.** We need not address whether there was probable cause with respect to the remaining charges—failure to disperse and obstructing a public passage—for the establishment of probable cause as to any one charge is sufficient to defeat Appellants' Fourth Amendment

claims. *Cf. Johnson*, 477 F.3d at 82 n. 9, 84–85 (applying this rule to malicious prosecution claim only where the circumstances leading to the arrest and prosecution are intertwined).

### E. *Conspiracy Claims*

 Appellants also brought conspiracy claims under 42 U.S.C. §§ 1983 and 1985(3) against Philly Pride and the City, arguing that they conspired together "to use the 'pink angels' to violate Plaintiffs' First Amendment rights and to ultimately set Plaintiffs up so they would be removed from the event and arrested." Appellants' Br. at 49. The District Court held, and we agree, that there is no evidence from which one could infer that Philly Pride and the City had an understanding or agreement to conspire against Appellants. To constitute a conspiracy, there must be a " 'meeting of the minds.' " *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Indeed, the evidence demonstrates that Philly Pride and the City "took diametrically opposed positions" regarding how to deal with Appellants' presence at OutFest. *Startzell*, 2007 WL 172400, at *18. The City rejected Philly Pride's requests to exclude Appellants from attending OutFest; moreover, the police forced the Pink Angels to allow Appellants to enter OutFest under threat of arrest. It was also the vendors' complaints, not requests by Philly Pride, that led the police officers to order Appellants to move toward OutFest's perimeter. There is no evidence of a conspiracy between the City and Philly Pride.

### IV.

### Conclusion

For the reasons set forth, we will affirm the judgment of the District Court granting summary judgment to Philly Pride and the City on all of Appellants' substantive claims.

STAPLETON, Circuit Judge, concurring:

This case is governed by our decision in *Gilles v. Davis.* 427 F.3d 197 (3d Cir. 2005). In *Gilles,* this Court found that a street preacher on a college campus who told passersby that "there are thousands of fornicators on this campus," there are "drunkards … everywhere," and alleged that the area was being overrun by "drugs, sex [and] booze," was engaging in protected speech. *Id.* at 201, 205. However, when the street preacher singled out a woman who had identified herself as a homosexual Christian for personal abuse—calling her a "Christian lesbo," a "lesbian for Jesus," and a "bestiality lover," and insinuating that she had "la[id] down with dogs"—this Court found his speech so "especially abusive" that it amounted to "fighting words." *Id.* Accordingly, we held that the police could properly stop the preacher from continuing his diatribe. *Id.* at 205.

Just like the street preacher in *Gilles,* the members of the Repent America group started out by preaching their beliefs in a general sense to a crowd known to be hostile to their viewpoint. This was protected. They then singled out a transgendered individual for abuse, repeatedly calling him a "she-man," telling him, "The mirror lied to you this morning. Your shadow is showing," and by suggesting that his sexual identity would send him to hell. *Startzell v. City of Philadelphia,* No. 05–05287, 2007 WL 172400, at *3 (E.D.Pa. Jan. 18, 2007). This was the functional equivalent of the preacher's unprotected conduct in *Gilles,* and for that reason, I conclude that these statements amounted to "fighting words" that merited police intervention. While not all eight members of the Repent America group used fighting words, once fighting words have been uttered, the police can intervene to the extent necessary to defuse the situation and prevent a breach of the peace. The response of the police in this instance was reasonably calculated to accomplish that legitimate objective.

While I agree that the rights of the Repent America protesters were not violated, I cannot subscribe to the twin justifications offered by the Court for its resolution of this appeal, namely: (1) that there is a First Amendment right to speak without interruption; or (2) that OutFest's permit provided a basis for the police to limit or end Repent America's protest.

The Court persuasively demonstrates that the Repent America group had just as much right to be present at the festival as did. the OutFest supporters and other members of the public. It also acknowledges that OutFest's pro-gay message and Repent America's anti-gay message were both protected speech. The police were thus presented with a situation where two groups with conflicting protected messages were equally entitled to be on the public street where the crowd was assembling and were equally entitled to attempt to communicate their respective messages to as many people as possible. What the Court fails to do is to explain satisfactorily why, in the absence of "fighting words" or their equivalent, the police in such a situation have the ability to favor one side over the other by requiring the disfavored side to relocate to the periphery of the festival. My understanding of the case law is that, when conflicting points of view clash in a public forum, neither side has a First Amendment right to speak without interruption, and the police must allow the competing groups to compete unless and until there are "fighting words," imminent violence or other serious threat to public safety. *See, e.g., Terminiello v. Chicago,* 337 U.S. 1, 5, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) ("freedom of speech, while not absolute, is nevertheless protected . . . unless shown likely to produce a clear and present danger of serious substantive evil that rises far above public inconvenience, annoyance or unrest").

I, of course, agree with the Court that the constitutionality of content-neutral restrictions designed to "regulate competing uses of public forums" is well-settled, and further agree that "content neutrality does not divest police officers of the ability to enforce valid permits and to ensure that permitted speech is allowed to take place." *Ante* at Maj. Op. pp. 200–01; *e.g., Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). Indeed, I believe it clear that the state can issue a valid permit granting someone the exclusive right to speak in an otherwise public forum at a particular place and time so long as the decision to grant such a permit is based on criteria that are content neutral, narrowly tailored to serve a significant governmental interest, and leave open alternative opportunities for communication. *E.g., Olivieri v. Ward,* 801 F.2d 602 (2d Cir.1986); *Sistrunk v. City of Strongsville,* 99 F.3d 194 (6th Cir.1996); *Bishop v. Reagan–Bush,* 819 F.2d 289 (6th Cir.1987) (No. 86–3287, 1987 WL 35970 (6th Cir. May 22, 1987)).

In the absence of "fighting words," however, these well-established principles would not have justified the favoritism shown to the OutFest supporters. All agree that the OutFest permit was a nonexclusive permit, and nothing in the record suggests that the City made a decision to grant OutFest the right to speak without interruption. While the Court seems to suggest that the police in effect issued an exclusive permit to the OutFest supporters based on the "disruption" caused by the Repent America group, this would not have been constitutionally permissible. Police may not, consistent with the First Amendment, silence protected speech based solely on their judgment that it is interfering with competing protected speech.

In *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the Supreme Court overturned the petitioner's conviction for common law breach of the peace based on his delivery of an anti-Catholic diatribe in a predominantly Catholic neighborhood. The Court explained that the criteria of common law breach of the peace provided the enforcement authority with a breadth of discretion inconsistent with the First Amendment:

[The conviction] was not pursuant to a statute evincing a legislative judgment that street discussion of religious affairs, because of its tendency to provoke disorder, should be regulated, or a judgment that the playing of a phonograph on the streets should in the interest of comfort or privacy be limited or prevented. Violation of an Act exhibiting such a legislative judgment and narrowly drawn to prevent the supposed evil, would pose a question differing from that we must here answer. Such a declaration of the State's policy would weigh heavily in any challenge of the law as infringing constitutional limitations. Here, however, the judgment is based on a common law concept of the most general and undefined nature.

\* \* \*

The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious. Equally obvious is it that a State may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions. Here we have a situation analogous to a conviction under a statute sweeping in a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application.

*Id.* at 307–08, 60 S.Ct. 900 (footnote omitted).

The Supreme Court reached similar conclusions in *Cox v. Louisiana,* 379 U.S. 536, 551, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), and *Terminiello,* 337 U.S. at 5, 69 S.Ct. 894. In both cases, the Court overturned convictions for "breaching the peace" where state law defined that crime as encompassing, respectively, (1) "to interrupt, to hinder, to disquiet," and (2) "speech [that] invites dispute ... or creates a disturbance."

I believe the "disruption" standard that the Court here endorses, like the "breach of the peace" standard in *Cantwell, Cox,* and *Terminiello,* provides the enforcement authority with excessive discretion.

I concur in the judgment of the Court based on *Gilles v. Davis,* 427 F.3d 197 (3d Cir.2005).[15]

---

**15.** Based on my conclusion that Repent America's members uttered "fighting words" during their demonstration, I believe that there was sufficient probable cause to arrest

them, negating any Fourth Amendment claims. Further, because I do not believe that Repent America's rights were violated, I see no basis for either their municipal liability or conspiracy claims.