OPINION
BARRY, Circuit Judge.
Plaintiff Municipal Revenue Services, Inc. (“MRS”), a Pennsylvania corporation that facilitates the purchase of delinquent municipal tax liens, appeals from the District Court’s grant of summary judgment in favor of Defendants John McBlain and Aldan Borough in this 42 U.S.C. § 1983 action. MRS also appeals from the Court’s partial grant of Defendants’ motion to dismiss.
At issue is whether MRS was deprived of “rights, privileges, or immunities secured by the Constitution and laws of the United States,” 42 U.S.C. § 1983, when McBlain, the Vice President of the Aldan Borough Council, called MRS’s business model “loan sharking with attorneys’ fees” at a local school board meeting. Because, absent exceptional circumstances not present here, we do “not ... view defamatory acts as constitutional violations,” Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 401 (3d Cir.2000), we will affirm.
I. Background
The William Penn School District (“District”) is a regional public school district located in Delaware County, Pennsylvania, comprised of six boroughs — Aldan, Colwyn, Darby, East Landsdowne, Landsdowne, and Yeadon. In early 2005, the District began exploring the possibility of selling its delinquent tax liens to generate additional revenue. According to the District’s chief operating officer, Joseph Otto, about twelve percent of the District’s residents do not pay their property taxes in a timely fashion, creating a yearly revenue shortfall of approximately three million dollars.
With the encouragement of at least one member of the nine-member William Penn School Board (“Board”), Otto invited three companies to give public presentations to the Board promoting their respective delinquent tax lien collection services. On July 14, 2005, MRS, Xspand, and the Portnoff Law Associates promoted their collection models, and, ultimately, Otto recommended MRS to the Board. In a memo dated October 13, 2005, Otto praised MRS’s approach as “much simpler” in that it would “not change the way the school district collects the delinquent taxes” and would allow the District to continue to “receive all taxes, interest, and penalties collected” less five percent in fees. (App. at 786.)[1]
At approximately the same time, in Delaware County, the City of Chester and the Chester Upland School District were finalizing a delinquent tax lien sale with Xspand. McBlain, who also served as the Delaware County solicitor, was tangentially involved in that sale, and was responsible for reviewing the terms of the sale for its potential impact on the Delaware County Tax Claim Bureau and its tax collection efforts. (Id. at 1476.) In that role, he issued an opinion letter endorsing the sale. *821 Despite that endorsement, McBlain expressed his general opposition to delinquent tax lien sales to Linda Cartisano, who was the solicitor for the City of Chester.
McBlain, who wears a number of hats in Delaware County — serving, in addition to his other roles, as solicitor for the Delaware County Redevelopment Authority, the Delaware County Economic Development Oversight Board, and various local zoning boards — is also involved in local politics. He is the chairman of the Republicans for Aldan and the treasurer of the Delaware County Republican Executive Committee. In yet another role, he represented the Delaware County Board of Elections in a dispute regarding Charlotte Hummel, a Democratic candidate for reelection to the Board from Landsdowne. The dispute reached the Supreme Court of Pennsylvania, where Hummel ultimately prevailed on October 14, 2005. The relief granted allowed Hummel to reclaim her seat on the Board.
Hummel’s election dispute involved Raymond Santarelli, a lawyer at the firm of Elliot, Greenleaf & Siedzikowski, P.C. (“EGS”), who filed an amicus brief for the Delaware County Democratic Party in support of Hummel. EGS also specializes in the transactional legal work involved in the sale of municipal tax liens. In fact, MRS recommends the firm’s services to municipalities that require a special counsel for the intricacies of the sale. In MRS’s view, “there is only one firm [— EGS — ] that made the investment ... to be qualified to do” delinquent tax lien work. (Id. at 1067). In each delinquent tax lien sale involving MRS, EGS has been hired as the municipality’s special counsel. Here, the parties agree that EGS stood to eara fees from an agreement between MRS and the District.[2]
On October 24, 2005, the Board was set to vote on a “move forward resolution” regarding the delinquent tax lien sale, which stated that the Board “accepted] the recommendation of the administration [of the District] to sell all of ... [its] past real estate tax liens ... to ... MRS[ ],” and authorized the administration to take the necessary steps “to undertake the sale.” (Id. at 1590.) Otto, the Board members, and Howell (MRS’s founder) all viewed the resolution as a step toward further negotiation with MRS, rather than an approval of the sale itself. (See, e.g., id. at 969 (Otto stating that the resolution was simply the next step in “evaluating] the [MRS] proposal”); id. at 1079 (Howell describing it as “preliminary to a final approval”); id. at 1323 (Board member stating that “basically all the move forward resolution was meant to do was to tell the administration ... to start negotiating with [MRS].”).) Several days prior to the Board meeting, McBlain heard about what he believed to be the advanced state of the District’s negotiations with MRS.
Consequently, McBlain attended the October 24 Board meeting to express his opposition to the delinquent tax lien sale.[3] He did so — as the parties agree — in his capacity as the Aldan Borough Council’s liaison to the Board. He voiced his concerns with the MRS deal generally, and the move forward resolution specifically, at the public “pre-session” to the Board meeting. Then, at the meeting, McBlain rose to speak during the time allotted for public comment. He stated, in relevant part:
*822 I want to speak to you about ... a proposed resolution ... to move forward to sell certain tax claims. I ask you to vote against this proposed resolution tonight. This is nothing more than loan sharking with attorneys’ fees, that’s all it is....
Before moving forward, I would also ask the [B]oard to tell us what are the attorneys’ fees, how many attorneys will be representing the ... District and ... what other attorneys will be getting paid as a result of this, and who are those attorneys?
H* 5¡í Hi
You know once you get into [the structure of the deal and the fees included], now you’re talking loan sharking money. Loan sharking with attorneys’ fees is all this is.
(Id. at 831-32.) Board president John McKelligot heard McBlain’s comments, “sort of perked up, and ... thought, oh, another night of vigorous public comment in the William Penn School District.” (Id. at 1286.) Board member Diane Leahan had a different reaction, rising to respond to McBlain and stating: “[T]o turn around and call this company a loan shark is, in my opinion, trouncing on slander, and I think it’s a disgrace.” (Id. at 1283.)
McBlain’s comments had no discernable effect on the “move forward” resolution vote, which took place later in the meeting. Seven Board members voted in favor of the resolution, including Robert Reardon who was Aldan Borough’s representative on the Board. Only McKelligot voted against the resolution, and his undisputed deposition testimony indicates that he opposed selling delinquent tax liens from the outset.[4]
Despite the Board’s approval of the resolution, the business relationship between MRS and the District did not “move forward.” Otto was unresponsive to MRS’s continuing efforts to consummate the delinquent tax lien sale. In his words, the costs of the deal turned out to be “double ... what [he] thought they were,” (id. at 975), and the District’s administration lost interest. Another Board member, by contrast, simply “assumed that somebody had basically pulled the plug on something.” (Id. at 1397.) To date, the District has not entered into a delinquent tax lien sale agreement with MRS or any of its competitors.
MRS filed this action, alleging that McBlain’s comments and the subsequent loss of business constituted impermissible retaliation for protected First Amendment activity; that the treatment it received relative to its competitors violated equal protection; that the reputation and property damages it suffered ran afoul of substantive and procedural due process protections; and that McBlain’s comments amounted to commercial disparagement under Pennsylvania law. MRS also sought to recover against Aldan Borough, assertting a Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), claim that the Borough fostered a customary disregard of constitutional rights. The District Court partially granted Defendants’ Federal Rule of Civil Procedure 12(b)(6) motion, dismissing the substantive and procedural due process counts. The Court subsequently granted Defendants’ motion for summary judgment on the First Amendment retaliation, equal protection, and Monell counts, and dismissed MRS’s state claim without prejudice.
On appeal, MRS contends that summary judgment was improperly granted because the District Court’s analysis involved several errors of law. It also contends that it *823 adequately pled both procedural and substantive due process violations.
II. Discussion
We have jurisdiction over a final order of the District Court pursuant to 28 U.S.C. § 1291, and “[o]ur standard of review of a grant of summary judgment is plenary.” Gardner v. State Farm Fire & Cas. Co., 544 F.3d 553, 557 (3d Cir.2008); see McTernan v. City of York, 564 F.3d 636, 646 (3d Cir.2009) (“we review the facts in the light most favorable to the nonmoving party”). We similarly “exercise plenary review of the District Court’s order granting defendant’s motion to dismiss.” Fellner v. Tri-Union Seafoods, L.L.C., 539 F.3d 237, 242 (3d Cir.2008).
A. Qualified Immunity
McBlain contends that he is shielded from liability by qualified immunity, and it is through that prism that we will address the merits of MRS’s arguments. “The doctrine of qualified immunity protects government officials ‘from liability for civil damages insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known.’ ” Pearson v. Callahan, — U.S. -, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). It reflects the “need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.” Id. In Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court mandated a two-step qualified immunity analysis— first, whether “the facts alleged show that the [official’s] conduct violated a constitutional right,” and, second, whether the right, if violated, “was clearly established.” In Pearson, the Court backed away from the previously-mandated sequence, stating, “while the sequence set forth [in Saucier ] is often appropriate, it should no longer be regarded as mandatory.” 129 S.Ct. at 818. We nonetheless begin by determining whether, given the facts in the record, MRS can establish a constitutional violation. Because it cannot, we need not proceed further.
B. First Amendment Retaliation
A public official “may not deny a benefit to a person on a basis that infringes his constitutionally protected ... interest in freedom of speech.” Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Otherwise, the official could indirectly “penalize and inhibit[ ]” the exercise of “constitutionally protected speech,” a result which he “could not command directly.” Id. (quotation marks and citation omitted). MRS contends that, in retaliation for its indirect association with the politically-active EGS law firm, McBlain used his local government post to disparage its business.[5]
“In general, constitutional retaliation claims are analyzed under a three-part test. Plaintiff must prove (1) that [it] engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation.” Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282 (3d Cir.2004). The threshold requirement, *824 then, is that MRS must “identify the protected activity that allegedly spurred the retaliation.” Id. We question whether it has done so, as the protected activity to which MRS points is its “association with ... an attorney for the Democratic party.” (Appellants’ Br. at 32.) The parties do not address whether a business that recommends the services of a politically-active law firm has engaged in protected conduct, and the matter was likewise unaddressed by the District Court.
Instead, the District Court focused on whether MRS was retaliated against, and concluded that it was not. The Court construed MRS’s claim as if it were “a claim against the [Board] because MRS argues that ... McBlain wielded such influence over the [Board] that his criticizing MRS effectively” ended its chances of landing the delinquent tax lien sale contract. (App. at 17 n. 8.) Thus, the Court held that even if McBlain “stymied [MRS’s] effort to contract with the [District] for impermissible political reasons,” his actions would not constitute retaliation because MRS did not have “a pre-existing business relationship with the [District].” (Id. at 17.) See Bd. of County Comm’rs, Wabaunsee County v. Umbehr, 518 U.S. 668, 685-86, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (“recognizing] the right of independent government contractors not to be terminated for exercising their First Amendment rights” but expressly not addressing “the possibility of suits by bidders or applicants for new government contracts who cannot rely on” a “pre-existing commercial relationship with the government”); McClintock v. Eichelberger, 169 F.3d 812, 817 (3d Cir.1999) (declining, in dicta, to extend Umbehr to allegations of retaliation absent a “preexisting commercial relationship with the public entity”).
MRS contends that the “retaliatory action was the attack by McBlain” at the October 24 Board meeting, “not the [Board’s] failure to award a contract,” and that this distinction allows it to establish a claim of retaliation. (Appellant’s Br. at 33.) Its contention fails. To amount to retaliation, the conduct must be “sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.” McKee v. Hart, 436 F.3d 165, 170 (3d Cir.2006) (quotation marks and citation omitted). In certain circumstances, such as those of public employees, that threshold is quite low. See, e.g., O’Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir.2006) (“A First Amendment retaliation claim will lie for any individual act which meets this ‘deterrence threshold,’ and that threshold is very low: as we [have stated] ... a cause of action is supplied by all but truly de minimis violations”) (citation omitted); Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir.2000) (holding that “a campaign of petty harassments” against a public employee is sufficient to establish retaliation) (quotation marks and citation omitted). Where, however, the alleged retaliatory act is a speech by a public official on a matter of public concern, other considerations are in play. See Suarez Corp. Indus, v. McGraw, 202 F.3d 676, 687 (4th Cir.2000); see also McKee, 436 F.3d at 170 (favorably citing Suarez). “Not only is there an interest in having public officials fulfill their duties, a public official’s own First Amendment speech rights are implicated.” Suarez, 202 F.3d at 687; see X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 70 (2d Cir.1999) (stating that the First Amendment “protects] the legislator’s right to state publicly his criticism of the granting of ... a contract to a given entity and to urge the administrators that such an award would contravene public policy”); Penthouse Int’l, Ltd. v. Meese, 939 F.2d 1011, 1016 (D.C.Cir.1991) (“If the First Amendment were thought to be violated any time a private citizen’s speech or writings were criticized by a government *825 official, those officials might be virtually immobilized.”). Similarly stated, a “limitation on the retaliation cause of action based on [a public official’s] speech is necessary to balance the [official’s] speech interests with the plaintiffs speech interests.” The Baltimore Sun Co. v. Ehrlich, 437 F.3d 410, 417 (4th Cir.2006).
“Thus, where a public official’s alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction or adverse regulatory action will imminently follow, such speech does not adversely affect a [company’s] First Amendment rights, even if defamatory.” Suarez, 202 F.3d at 687 (emphasis added). Here, while MRS alleges that McBlain “exerted ‘pressure’ on the decisionmakers, there is no allegation that such ‘pressure’ took the form of anything other than speech.” X-Men Sec., 196 F.3d at 71. Perhaps McBlain over-spoke in expressing his opposition to the delinquent tax lien sale by equating MRS with a loan shark. His words, however, were “obviously used here in a loose, figurative sense, to demonstrate ... strong disagreement,” Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin, 418 U.S. 264, 284, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), and were part and parcel of what we have described as the “often treacherous waters of government contracting.” Boyanowski, 215 F.3d at 404; cf. Greenbelt Coop. Publ’g Ass’n v. Bresler, 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (“even the most careless [listener] must have perceived that the [expression] was no more than rhetorical hyperbole”). Even assuming MRS can establish protected First Amendment activity, that activity is not a shield against criticism from public officials unless the criticism strays into “threats, intimidation or coercion.” See X-Men Sec., 196 F.3d at 71. McBlain’s comments did not reach that level, and they cannot form the basis of a First Amendment retaliation action.
C. Equal Protection
MRS also asserts that the District Court erred in granting summary judgment in favor of McBlain on its “class of one” equal protection claim. To recover, MRS must, “at the very least,” establish “that (1) the defendant treated [it] differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.” Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir.2006). “Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects.” Startzell v. City of Phila., 533 F.3d 183, 203 (3d Cir.2008) (quotation marks and citation omitted); see Safeguard Mut. Ins. Co. v. Miller, 472 F.2d 732, 733 (3d Cir.1973) (corporations are “deemed to be persons within the meaning of the [E]qual [Protection and [D]ue [P]rocess [Clauses of the [Fourteenth [A]mendment”). In MRS’s view, it was similarly situated to Xspand, a delinquent tax lien purchasing company that was treated differently by McBlain.
We note that on October 24, 2005, the Board was only voting on whether to “move forward” with a delinquent tax lien sale proposal put forth by MRS. Because Xspand did not have a proposal before the Board, McBlain’s failure to speak out against Xspand’s business model cannot be considered unequal treatment. MRS also asserts that McBlain’s approval of the City of Chester and Chester Upland School District delinquent tax lien sale constituted unequal treatment. The District Court properly concluded otherwise, explaining, first, that “there is no evidence that ... McBlain personally supported the Chester/Xspand agreement or that he took any *826 action, beyond what was required of him as solicitor of Delaware County to advance the transaction.” (App. at 13.) Second, the Court accurately described why MRS’s dealings with the Board and Xspand’s dealings with Chester were not “alike in all relevant aspects”:
McBlain was neither the elected representative nor attorney for any party with a stake in the success of the Chester/Xspand agreement. In contrast, the [Board] resolution directly impacted ... McBlain’s constituents on a budgetary matter of concern to him as [an] elected official. Accordingly ... McBlain’s treatment of Xspand in the Chester transaction cannot be compared to his treatment of MRS’ proposal to the [Board]....
{Id. at 13.)
D. Procedural & Substantive Due Process
The District Court’s dismissal of MRS’s substantive and procedural due process claims was likewise proper, as MRS did not allege a protected interest. “To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment’s protection of ‘life, liberty, or property,’ and (2) the procedures available to him did not provide ‘due process of law.’ ” Hill, 455 F.3d at 233-34 (citation omitted). MRS argues that McBlain’s actions deprived it of its “constitutionally protected [property] right to continued business.” (Appellant’s Br. at 48.) It is, however, quite clear that the possibility of a future contract with a municipality is not a property interest that warrants procedural due process protection. See Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (“To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.”); Indep. Enter., Inc. v. Pittsburgh Water & Sewer Auth., Inc., 103 F.3d 1165, 1178 (3d Cir.1997) (“[0]ne who bids on a public contract has no legitimate expectation of receiving it until the contract is actually awarded.”). MRS also cannot establish a protected liberty interest, as “[b]y now, it is clear that reputation alone is not an interest protected by the Due Process Clause.” Dee v. Borough of Dunmore, 549 F.3d 225, 234-35 (3d Cir.2008) (emphasis in original) (quotation marks and citations omitted). Instead, “to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest,” id. (emphasis in original) (quotation marks and citations omitted), and the loss of a business opportunity is insufficient to establish the latter “plus” requirement. See Sturm v. Clark, 835 F.2d 1009, 1012-13 (3d Cir.1987) (“[Financial harm resulting from government defamation alone is insufficient to transform a reputation interest into a liberty interest” because “[m]ost, if not all, charges of defamation are inevitably accompanied by financial loss.”).
Nor can MRS establish a fundamental property or liberty interest worthy of substantive due process protection. See Nicholas v. Penn. State Univ., 227 F.3d 133, 142 (3d Cir.2000). The ability to compete for municipal contracts is not a fundamental property interest, Independent Enterprises, 103 F.3d at 1180, and “defamatory statements that curtail a plaintiffs business opportunities [do not] suffice to support a substantive due process claim.” Boyanowski, 215 F.3d at 400. *827 Thus, even if we were to accept for the sake of argument that McBlaine’s remarks were defamatory, MRS’s due process arguments fail.
E. Monell
Finally, the District Court properly concluded that there is no genuine issue of material fact as to whether MRS can establish that “through its deliberate conduct, [Aldan Borough] was the ‘moving force’ behind the [constitutional] injuries] alleged.” Bd. of County Comm’rs of Bryan County v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (emphasis in original). “For § 1983 liability to attach, [MRS] must show that the [Borough] was responsible for any constitutional violations.” Startzell, 533 F.3d at 204; see id. (“/FJor there to be municipal liability, there ... must be a violation of [MRS’s] constitutional rights.”) (quotation marks and citations omitted). Because MRS’s rights were not violated, we need not further address the claim against Aldan Borough — “[i]t too was properly dismissed.” Id.[6]
III. Conclusion
For the foregoing reasons, we will affirm the District Court’s orders of March 20, 2007, 2007 WL 879004, and August 4, 2008, 2008 WL 2973852, which, taken together, dispose of MRS’s claims against McBlain and Aldan Borough.

. The primary attraction of the potential delinquent tax lien sale was the prospect of an up-front payment. MRS proposed to pay the District ninety percent of the value of delinquent tax liens that had been outstanding for four years or less in one lump-sum. Xspand, by contrast, “would purchase the delinquent [tax liens only] after [it] performed a comprehensive review of all outstanding delinquent properties,” and its initial review indicated that its up-front payment would be calculated only on the basis of liens that had been outstanding for three years or less. (Id. at 785.)
Portnoff was interested only in the prospective collection of delinquent tax liens. Accordingly, the firm did not offer an up-front payment, and its proposal was not seriously considered.

. EGS represents MRS in the present case.

. On the same day, the City of Chester and the Chester Upland School District’s delinquent tax lien sale agreement was finalized with Xspand. MRS contends, but the record does not establish, that Xspand is financially allied with McBlain's partisan interests.

. Board member Dorothy Reed was absent. (App. at 1613.)

. We need not address whether a corporation, like MRS, is entitled to the same protection as a private individual against First Amendment retaliation, as the parties have not briefed the issue and it does not affect our holding. We note, however, that there is no doubt that MRS may assert constitutional claims on its own behalf. See, e.g., Addiction Specialists, Inc. v. Twp. of Hampton, 411 F.3d 399, 407 n. 6 (3d Cir.2005) (collecting cases).

. MRS also contends that its discovery of McBlain's telephone records was improperly limited to three months before and three months after the October 24 Board meeting. We note that "questions concerning the scope of discovery are among those matters which should be almost exclusively committed to the sound discretion of the [District [C]ourt, and we see no reason to disturb the [C]ourt’s discovery ruling here." Molthan v. Temple Univ., 778 F.2d 955, 958 (3d Cir.1985) (quotation marks and citations omitted).